**BEFORE THE UNITED STATES
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| IN RE: | MDL No._____ |
|---|---|
| BABY FOOD MARKETING, SALES PRACTICES AND PRODUCTION LIABILITY LITIGATION | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS TO
THE EASTERN DISTRICT OF NEW YORK PURSUANT TO 28 U.S.C. § 1407**

## I.   INTRODUCTION

Pursuant to 28 U.S.C. § 1407 and Rule 6.2(a) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Plaintiffs Lori-Anne Albano, Myjorie Philippe, Rebecca Telaro and Alyssa Rose (collectively, "Albano Plaintiffs") in the case titled *Albano, et al. v. Hain Celestial Group, Inc., et al.,* Case No. 21-cv-01118 (E.D.N.Y.), respectfully submit this memorandum of law in support of their motion to transfer all Related Actions to the United States District Court, Eastern District of New York, where the most of the Related Actions are pending and where the first of the Related Actions in the State of New York was filed.

Plaintiffs in the Related Actions bought baby foods such as oatmeal and rice cereals, purees, and snacks manufactured, marketed, and sold by the following eight different food manufacturers: Beech-Nut Nutrition Company; Campbell Soup Company; Gerber Products Co.; Hain Celestial Group, Inc.; Northern Castle Partners; Nurture, Inc.; Plum, PBC; and Walmart, Inc. ("Defendants").  Plaintiffs were horrified to learn that Defendants knowingly sold baby foods containing high levels of toxic heavy metals; specifically, inorganic arsenic, lead, cadmium, and mercury.

Heavy metals in baby foods provide no health benefits, and there are no established safe levels.  Moreover, numerous studies over the last several decades have confirmed that inorganic arsenic, lead, cadmium, and mercury are developmental neurotoxins that are harmful to a baby's developing brain and nervous system.  On February 4, 2021, the U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform issued a detailed report titled, *Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium and Mercury*, which revealed that testing showed that Defendants' finished products and/or ingredients contained harmful levels of toxic heavy metals and that the products with toxic

ingredients were sold anyway, even if the testing results exceeded the company's internal thresholds. For example, Beech-Nut sold baby food products with ingredients that tested as high as 886.9 parts per billion ("ppb") lead; Hain used ingredients in baby foods testing as high as 352 ppb lead; and Nurture's finished products tested as high as 641 ppb lead. Further, Campbell and Plum sold finished products that tested as high as 24.3 ppb cadmium; Gerber sold finished products testing as high as 27.7 ppb cadmium; Northern Castle sold Sprout finished products that tested as high as 39.5 ppb cadmium; and Walmart sold finished baby food products testing as high as 26.1 ppb cadmium. These amounts are excessive considering that the Food and Drug Administration has set the maximum allowable of lead in bottled water at 5 ppb and cadmium at 5ppb.

For the purposes of gaining the trust of parents and increasing the sales of their baby food products, Defendants hold themselves out to the public as family companies that care about children and prioritize selling healthy and nutritious baby foods. On their food labeling, Defendants represent that their food products are healthy and nutritious for babies and do not contain harmful ingredients or chemicals. Defendants, however, fail to disclose material facts to consumers, including that the baby food products contain harmful levels of toxic heavy metals. If parents knew this, they would not have bought the baby food products or would have paid less for them.

On behalf of consumers nationwide who bought Defendants' baby food products, Plaintiffs in the Related Actions seek damages, rescission, and/or restitution, including, but not limited to, all money paid toward the purchase of the baby food products, and an order enjoining Defendants from selling baby foods that are labeled in a false and misleading manner.

Albano Plaintiffs are aware of 42 other individual and proposed class actions that have been filed on behalf of consumers and expect additional cases to be filed nationwide. Based on the

numerous common questions of fact and law involved, the compelling need to establish uniform and consistent standards in conducting pretrial discovery and motion practice, and because the most logical and convenient location for these proceedings is the Eastern District of New York, Albano Plaintiffs respectfully request coordinated proceedings there before District Judge Joanna Seybert. The Related Actions currently pending in 12 federal districts throughout the United States meet the requirements for transfer pursuant to 28 U.S.C. § 1407, and therefore, transfer of these actions is warranted.

## II. BACKGROUND

This motion for transfer involves at least 43 actions—including 38 proposed class actions—pending in 12 different federal district courts asserting common factual allegations and involving overlapping claims and legal issues. Albano Plaintiffs expect additional actions to be filed in the federal courts alleging similar claims.

### A. Plaintiffs

The various Plaintiffs in this litigation have all filed proposed class actions arising from Defendants' false and misleading advertising and labeling of their baby food products. Plaintiffs in the Related Actions all bought Defendants' baby food products in the United States, and many of them bought baby foods from multiple Defendants. Each of the pending cases presents a common core of facts, in that each (i) alleges that Defendants' baby food products tested for harmful heavy metals; (ii) alleges that Defendants' food labeling was false and misleading and failed to disclose material facts; (iii) asserts economic injuries arising from Defendants' wrongful conduct; and (iv) seeks monetary and equitable relief. Indeed, the factual allegations in the Complaints are nearly identical in numerous critical respects. Plaintiffs in the Related Actions

allege that they would not have purchased the Defendants' baby food products, or would have paid less for them, but for the misrepresentations and failure to disclose material facts.

Plaintiffs in the Related Actions (at least 43 of which were pending as of March 8, 2021) are geographically diverse, residing in over 30 different states located across the country.

**B.     Defendants**

Each of the Defendants does business in all 50 states and the District of Columbia.

Defendant Beech-Nut Nutrition Corporation is incorporated in New York and maintains its headquarters in Amsterdam, New York.

Defendant Campbell Soup Company is incorporated in New Jersey and maintains its headquarters in Camden, New Jersey.  Defendant Campbell is the parent company of Plum, PBC.

Defendant Hain Celestial Group, Inc. is incorporated in Delaware and maintains its headquarters in Lake Success, New York.

Defendant Gerber Products, Co. is incorporated in Delaware and maintains its headquarters in Arlington, Virginia.

Defendant North Castle Partners (d/b/a Sprout Foods, Inc.) is incorporated in Delaware and maintains its headquarters in Greenwich, Connecticut.

Defendant Nurture, Inc. is incorporated in Delaware and maintains its headquarters in New York, New York.

Defendant Plum, PBC is incorporated in Delaware and maintains its headquarters in Emeryville, California.

Defendant Walmart, Inc. is incorporated in Delaware and maintains its headquarters in Bentonville, Arkansas.

C.     **Overview of Claims**

Numerous scientific studies conducted over the last several decades have confirmed that inorganic arsenic, lead, cadmium, and mercury are developmental neurotoxins that are harmful to a baby's developing brain and nervous system.  The Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ranks inorganic arsenic, lead, cadmium, and mercury at the top of its list of substances present in the environment that pose the most significant threat to human health.  There are no established safe levels of these substances for baby foods.

Babies and children who consume inorganic arsenic, lead, cadmium, or mercury are at risk of suffering health problems, a loss of intellectual capacity and behavioral problems such as attention-deficit/hyperactivity disorder ("ADHD"), among other things.  Even the consumption of small amounts over time can increase the risk of bladder, lung and skin cancer, and Type 2 Diabetes.  Moreover, medical professionals and scientists alike agree that early exposure to heavy metals can have long-term effects that are irreversible.

On February 4, 2021, the U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform issued a detailed report titled, *Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* ("Congressional Report").  The Congressional Report revealed that some of the largest baby food manufacturers in an industry that generates over $50 billion annually in sales knowingly distributed and sold baby food containing harmful heavy metals such as inorganic arsenic, lead, cadmium, and mercury. Defendants were identified in the Congressional Report as companies selling baby foods containing harmful heavy metals in amounts many times higher than allowed for other products like bottled water for which the FDA has set maximum allowable limits of 10 ppb inorganic arsenic, 5 ppb lead, and 5 ppb cadmium. Further, some of the Defendants set internal company

standards allowing harmful levels of toxic heavy metals in their baby food products, and internal documents produced to the U.S. House of Representatives show that certain companies sold foods that exceeded their own internal limits.

Many parents were dismayed when news of the Congressional Report's findings were published considering that for years the Defendants have represented to consumers that they are family companies that can be trusted to provide nutritious and healthy food for children without harmful substances and ingredients.  The images and messaging on Defendants' product labels conveyed to consumers that the food products were appropriate, safe, healthy, and nutritious for babies.  Unfortunately, Defendants' representations were false and misleading because their products were not safe and contained harmful heavy metals. Defendants also failed to disclose material facts, including that the products were unsafe for babies; that the products contained heavy metals; the levels of the heavy metals; that testing showed that their products contained harmful heavy metals; or that their policies permitted the sale of products with harmful levels of heavy metals.

### D.   Status of the Actions

The Related Actions were filed beginning on February 5, 2021 after the Report was published on February 4, 2021.  Given the infancy of these cases, no discovery has been taken; nor have any other actions occurred on the progress to trial such that transfer would be unduly prejudicial or inefficient. All cases are at the same early procedural stage, providing another good basis to coordinate them.

### III.   LEGAL ARGUMENT

Pursuant to 28 U.S.C. § 1407(c)(2), a party in any action may file a motion seeking transfer and consolidation when: 1) the civil actions pending in different districts involve one or more

common questions of fact; 2) transfers will be for the convenience of parties and witnesses; and 3) transfer will promote the just and efficient conduct of such actions. When common questions of fact exist like with these cases, the JPML should consolidate and transfer actions to prevent duplication of discovery and eliminate the possibility of inconsistent pretrial rulings. *In re Eastern Airlines, Inc. Flight Attendant Weight Program Litig.*, 391 F. Supp. 763, 764 (J.P.M.L. 1975). Yet transfer under § 1407 does not require the factual issues to be completely identical or even a majority of factual or legal issues to be identical. *In re Rembrandt Techs., L.P.*, 493 F. Supp. 2d 1367, 1369 (J.P.M.L. 2007); *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 173 F. Supp. 2d 1377, 1379 (J.P.M.L. 2001).

The multidistrict statute serves as a means for conserving judicial resources in situations like this one where numerous cases involving common questions of fact are filed in different judicial districts. *Royster v. Food Lion (In re Food Lion)*, 73 F.3d 528, 531-32 (4th Cir. 1996). Section 1407 promotes efficiency and consistency. *Illinois Mun. Ret. Fund v. Citigroup, Inc.*, 391 F. Supp. 844, 852 (7th Cir. 2004). Otherwise, pretrial discovery and litigation demands might "disrupt the functions of the federal courts." *In re Phenylpropanolamine Prod. Liab. Litig.*, 460 F.3d at 1230. With pretrial litigation so likely to overlap, transfer will "promote the just and efficient conduct of [the] actions." 28 U.S.C. 1407; *see also Manual for Complex Litigation* (Fourth) § 20.131 (2010) ("The objective of transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts."). The Panel has repeatedly centralized actions focused on a manufacturer's liability for unsafe products. *See, e.g., In re ZF-TRW Airbag Control Units Prods. Liability Litig.*, 410 F. Supp. 3d 1357, 1361 (J.P.M.L. 2019); *In re Davol NC./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liability Litig.*, 316 F. Supp. 3d 1380, 1381 (J.P.M.L. 2018).

### A. Plaintiffs' claims allege common questions of law and fact against the same Defendants.

A party seeking transfer and consolidation under Section 1407 must first show common questions of law and fact. Plaintiffs have brought claims against these baby food manufacturers after numerous studies and the Congressional Report confirmed that Defendants knowingly sold baby foods containing inorganic arsenic, lead, cadmium, and mercury. The common thread of the Plaintiffs' allegations here are the same—whether Defendants' misrepresented that their baby foods were suitable and safe for consumption by babies despite knowing that the baby foods contain heavy metals. The baby food manufacturers at issue are some of the largest in the United States. Consequently, Plaintiffs seek damages because they would not have purchased or would have paid less if they had known that the baby food was unsafe and unsuitable for babies, or if they knew that Defendants' internal policies permitted the sale of baby food products with harmful heavy metals.

Even if some differences in the cases exist, a transferee judge possesses numerous tools and discretion to apply pretrial techniques to address any differences in case management. *See, e.g., In re Lehman Bros. Holdings, Inc.*, 598 F. Supp. 1362, 1364 (J.P.M.L. 1993). Centralization helps minimize duplication of effort and burden on Plaintiffs and Defendants. *See In re Factor VIII or IX Concentrate Blood Prods. Prod. Liab. Litig.*, 853 F. Supp. 454, 455 (J.P.M.L. 1993). There is no reason why transfer and consolidation would not be manageable and achieve the objectives sought by Section 1407.

Importantly, centralization of these matters minimizes the risk of inconsistent discovery and other pretrial rulings. The pending actions all seek class certification under Fed. R. Civ. P. 23. Although alleged under different states' laws, the legal theories include unfair business practices, violations of various state consumer protection statutes, breach of implied warranty of merchantability, unjust enrichment, and fraudulent concealment and omission. Even though the

states' laws may vary, the allegations against Defendants and discovery needed on those allegations is the same. "[T]he presence of additional or differing legal theories is not significant when the actions still arise from a common factual core . . ." *In re Oxycontin Antitrust Litig.*, 542 F. Supp. 2d 1359, 1360 (J.P.M.L. 2008). Common issues of fact exist with these cases, so the pending actions satisfy the first requirement for transfer under Section 1407.

> **B.  Transfer will serve the convenience of the parties and prevent duplicative discovery on the claims and defenses in these actions.**

The JPML's transfer and consolidation of these actions will also serve the convenience of the parties and prevent duplicative discovery. The first cases against Defendants were filed on February 5, 2021, meaning that responsive pleadings are not even due yet. All of the cases are just beginning. Now is the optimal time to transfer and consolidate to avoid duplicative discovery based upon the overlapping issues of fact and law. Consider the burden if 43 cases proceed with depositions of Defendants' current and former employees, Rule 30(b)(6) witnesses, and expert witnesses, not to mention the burden on all parties of propounding and responding to 43 sets of written discovery. *See, e.g., in re Pilot Flying J Rebate Contract Litig.*, 11 F. Supp. 3d 1351, 1352 (J.P.M.L. 2014) (finding that centralization avoids repetitive depositions and duplicative document discovery). On the other hand, transfer and consolidation avoids different federal courts from needing to oversee these actions across venues all over the country with different pretrial schedules, judicial decisions, and local procedural requirements.

Nothing has happened in any of these cases that will be lost through transfer and coordination by the JPML. And, the consolidation of pretrial litigation in these cases benefits both Plaintiffs and Defendants. Pretrial transfer often reduces delays and costs for plaintiffs and allows plaintiffs' counsel from all cases to coordinate their efforts and share the pretrial costs and workload. *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 173 F. Supp. 2d 1377, 1379 (J.P.M.L. 2001). The

Defendants enjoy the same cost savings and efficiency benefits. Instead of deposing crucial witnesses countless times, each fact witness will likely be deposed only once. Defendants will not need to depose different experts in different cases or even hire different experts to rebut varying expert opinions from Plaintiffs. Document production will be streamlined because Defendants will only have to respond to one set of written discovery rather than a different set in each case. The burdens on the Defendants' operations will be minimized through transfer and consolidation.

In addition, transfer avoids the pitfalls of piecemeal litigation by resolving disputes related to common issues in a singular proceeding. *In re StarLink Corn Prod. Liab. Litig.*, 152 F. Supp. 2d 1378, 1380 (J.P.M.L. 2001). Only through coordinated pretrial procedures on these matters can the parties conserve the time and financial resources of the judiciary and parties, while serving the dual purpose of eliminating the possibility of inconsistent rulings in parallel proceedings. *See, e.g., In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*, 883 F. Supp. 2d 1355, 1356 (J.P.M.L. 2012). Transfer allows the case to proceed before a single judge who can establish a pretrial schedule and administration on both common and uncommon issues. *In re Smith Patent Litig.*, 407 F. Supp. 1403, 1404 (J.P.M.L. 1976); *see also In re Nexium (Esomeprazole) Prod. Liab. Litig.*, 908 F. Supp. 2d 1362, 1363 (J.P.M.L. 2012) (transferee courts use any number of pretrial techniques such as separate discovery and motion tracks to manage any individual questions of fact). Otherwise, the burden and risk of delay will be unavoidable. Because transfer and consolidation serves all of these purposes, the JPML should enter an order consolidating and transferring these actions to one court.

### C. Transfer promotes the just and efficient conduct of these actions.

All of the factors that this Panel considers are advanced by transfer and consolidation of these pending actions. The factors that the JPML has considered in past cases for whether the just and efficient conduct of these actions will be advanced by transfer include:

- avoidance of conflicting rulings in various cases;

- prevention of duplication of discovery on common issues;

- avoidance of conflicting and duplicative pretrial conferences;

- advancing judicial economy; and

- reducing the burden on the parties by allowing division of workload among several attorneys.

*See, e.g., In re Endangered Species Act Section 4 Deadline Litig.,* 716 F. Supp. 2d 1369, 1369 (J.P.M.L. 2010); *In re Bristol Bay, Salmon Fishery Antitrust Litig.,* 424 F. Supp. 504, 506 (J.P.M.L. 1976). Each factor and how it is met is discussed below.

Transfer is crucial to avoiding conflicting rulings. As of this date, Plaintiffs have identified 43 cases filed in 12 different judicial districts across the country. If the cases proceed separately or even consolidated within these districts, at least 12 different federal courts will rule on the common factual and legal issues in these cases. Different counsel will employ different strategy. Different Plaintiffs will involve different factual issues. And different jurists will decide issues differently. All of these issues create serious risk of conflicting rulings that results in confusion and potentially inconsistent obligations for Defendants.

Duplicative discovery cannot be avoided if the cases proceed separately. In contrast, a single judge can preside over the case in a manner that reduces duplicative witness testimony, encourages efficiency for all parties, and streamlines the parties' costs and expenses into one case rather than many. *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 65 F. Supp. 3d 1402, 1405 (J.P.M.L. 2014) (holding that centralization will eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel, and the judiciary); *see also In re Tylenol Mktg., Sales Practices & Prods. Liab. Litig.*, 936 F. Supp. 2d 1379, 1380 (J.P.M.L. 2013)

(concluding that centralization prevents inconsistent pretrial rulings on Daubert issues and other matters). By way of examples, common issues in this case such as Defendants' alleged misrepresentations, the presence of heavy metals in the baby foods, and damages can all be considered one time rather than numerous different times. This factor is met.

In examining the third and fourth factors together, transfer and consolidation prevents the certainty of duplicative pretrial conferences in the absence of transfer. Courts would need to conduct an initial Rule 16 conference at least 12 times (even assuming that each district consolidates all pending actions within that district), as opposed to one time if the JPML orders transfer and consolidation. Numerous other conferences concerning discovery disputes, scheduling issues, and any evidentiary hearings that arise would occur again and again in different courts. Conflict with rulings is very likely, if not inevitable. The advancement of judicial economy for the fourth factor is apparent.

Finally, the burden on parties by allowing for division of workload is another factor that wholly supports transfer and consolidation. If one MDL Court presides over the case, that Court will create a leadership structure for Plaintiffs that will encourage efficient litigation of the case. Plaintiffs' time and resources will be streamlined into one team, rather than spread across duplicative litigation across the country. The same holds true for Defendants. Rather than incur costs for legal counsel and expenses across numerous districts, Defendants can minimize the costs and burdens on their companies by litigating the case in one district. In the absence of consolidation and transfer, each judicial district will have its own leadership appointments, none of which will necessarily coordinate with the other leadership. Division of labor will be challenging. The increased costs will be staggering. As a result, this Court should order transfer and consolidation because all of these factors have been met.

### C. The Proper Transferee Forum is the Docket of Judge Joanna Seybert in the Eastern District of New York.

The docket of the Honorable Joanna Seybert in the Eastern District of New York is the appropriate transferee district for all the Related Actions. First, the Eastern District of New York has a strong nexus to this litigation. Three of the Defendants are located in the state of New York, more than any other state, one of which, The Hain Celestial Group, Inc. ("Hain"), is directly headquartered in the Eastern District of New York. Additionally, 13 of the 43 federal lawsuits filed against the Defendants are pending in the Eastern District of New York—more than any other district court. Second, transfer of all the Related Actions to the Eastern District of New York will serve the convenience of the parties and witnesses and promote the just and efficient direction of this litigation as it is geographically close to three of the Defendants and easily accessible to the remaining Defendants. Finally, transfer to Judge Seybert is appropriate because she presides over the first case filed in the district and has more cases assigned to her than any other judge. Judge Seybert has experience presiding over a multidistrict litigation in the past and is a highly qualified, well respected jurist, uniquely suited to preside over the complex procedural and organizational challenges of multidistrict litigation. For these reasons, transfer to Judge Seybert's docket is appropriate.

#### 1. The Eastern District of New York has a strong nexus to this litigation.

The district court that has the strongest nexus to the litigation will often be the appropriate district for transfer. *In re Reciprocal of Am. (ROA) Sales Practices Litig.*, 281 F. Supp. 2d 1356, 1358 (J.P.M.L. 2003). The location of the defendants' headquarters is one consideration in that analysis because the location of a defendant's headquarters in or close to that district "implies that relevant documents and witnesses will likely be found there." *In re Foundry Resins Antitrust Litig.*, 342 F. Supp. 2d 1346, 1347 (J.P.M.L. 2004); *see also In re Auto. Refinishing Paint Antitrust Litig.*,

13

177 F. Supp. 2d 1378, 1379 (J.P.M.L. 2001) (noting transfer to the Eastern District of Pennsylvania was appropriate where a number of the defendants were located in the Northeastern United States). Defendant Hain is headquartered in Lake Success, New York, in the Eastern District of New York, and according to Hain's filing with the New York Secretary of State, Hain's Principal Executive Office and its Chief Executive Officer are located in Lake Success, New York.[1] As recently as 2012, Hain employed over 200 people in the district before expanding its headquarters.[2] It is highly likely that many of the witnesses and documents relevant to the claims against Hain are located in the Eastern District of New York. Although not headquartered in the district, Defendant Nurture, Inc.'s headquarters is just over 50 miles from the Eastern District of New York's Central Islip division. Considering its proximity, it is likely that many witnesses with pertinent information to the claims against Nurture reside in the Eastern District of New York as well.

Also relevant to the nexus inquiry, the Panel considers which district has the most currently filed cases. *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec.,* 1984, 601 F. Supp. 1035, 1036 (J.P.M.L. 1985); *see also In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 559 F. Supp. 2d 1405, 1406 (J.P.M.L. 2008) (finding transfer to the District of Maine was appropriate because a majority of the actions were pending there, and a defendant was headquartered there). Presently, 43 federal lawsuits are active, in 12 different federal district courts, against the Defendants. Thirteen of those cases are pending in the Eastern District of New York—more than any other district court. This factor weighs in favor of centralizing the litigation there. No doubt additional cases will be filed in the Eastern District of New York as well since it

---

[1] N.Y. Dep't of State, Div. of Corps., *Search the Corporation & Business Entity Database*, https://www.dos.ny.gov/corps/bus_entity_search.html (last visited Mar. 8, 2021).
[2] *Governor Cuomo Announces Hain Celestial to Expand Its International Corporate Headquarters in Nassau County* (May 11, 2012), https://www.governor.ny.gov/news/governor-cuomo-announces-hain-celestial-expand-its-international-corporate-headquarters-nassau.

represents a massive population center and is home to the Defendant Hain and hundreds of thousands of class members.[3]

### 2. The Eastern District of New York is a convenient forum for the litigants.

The convenience of the proposed forum for the parties and potential witnesses is an important factor when considering transfer. *In re Union Carbide Corp.*, 601 F. Supp. at 1036. The Eastern District of New York's proximity to a number of the Defendants, as well as its easy accessibility make it a convenient forum for the parties as well as potential witnesses to the litigation. *Id.* The Eastern District of New York is geographically speaking, close to Hain, Beech-Nut, and Nurture's offices as all three are headquartered in New York—the most Defendants of any state. Defendant Campbell Soup Company's headquarters are also relatively close in Camden, New Jersey—less than 150 miles away. And while the other Defendants are headquartered elsewhere, the Central Islip Courthouse is located less than 8 miles from the Long Island MacArthur Airport, and is readily serviced by one of the largest airports in the country, John F. Kennedy International, as well as LaGuardia airport, making it easily accessible to the parties, counsel, and witnesses from other states or countries.

Consolidating in the Eastern District of New York, rather than separate MDLs against each Defendant, would also conserve judicial resources and prevent undue burden on the named Plaintiffs, many of whom have claims against multiple Defendants. *See In re: AndroGel Prod. Liab. Litig.*, 24 F. Supp. 3d 1378, 1379 (J.P.M.L. 2014) (declining to consolidate separate MDLs where plaintiffs purchased testosterone therapies from multiple defendants). As discussed above, the factual and legal claims against the Defendants are essentially the same, discovery can easily

---

[3] U.S. Census Bureau, *QuickFacts*, https://tinyurl.com/ykwvsr3k (July 1, 2019) (over 8 million people in the five counties constituting District).

15

be consolidated, and any discovery disputes should be uniformly decided.  Separate MDLs would in this case would undermine the purpose of Section 1407.  Absent a transfer of all the cases to the Eastern District of New York, the Defendants and the Plaintiffs will be required to engage in duplicative discovery efforts by the parties and their counsel in multiple courts, and to litigate the same legal issues, posing a serious risk of inconsistent legal outcomes, necessitating appeals and wasting both the parties and the judiciaries resources.  *See In re Vytorin/Zetia Mktg., Sales Practices & Prod. Liab. Litig.,* 543 F. Supp. 2d 1378, 1380 (J.P.M.L.  2008) (finding centralization appropriate to prevent inconsistent rulings and to conserve the resources of the parties, their counsel, and the judiciary) As explained, the Eastern District of New York is a convenient forum for all the parties involved, and transfer of all Related Actions to the Eastern District of New York is simply the most practical solution.

### 3.   Judge Joanna Seybert has experience with multi-district litigation and will effectively and efficiently manage this litigation.

Finally, the Panel may also consider the judicial experience of a transferee judge, the number of cases before them, and their familiarity with multidistrict litigation before transfer.  *See In re Welding Rod Prod. Liab. Litig.,* 269 F. Supp. 2d 1365, 1367 (J.P.M.L.  2003) (noting the transferee judges' previous experience with multidistrict products liability litigation); *In re Auto. Refinishing Paint Antitrust Litig*., 177 F. Supp. 2d at 1379.  (noting that the majority of related actions were pending in front of one judge when transferring to the Eastern District of Pennsylvania).  Serving in the Eastern District of New York, the Honorable Joanna Seybert is an excellent jurist, with over 27 years of experience as a district court judge since her appointment by President William J.  Clinton in November 1993.[4] A true public servant, Judge Seybert started her

---

[4] *See* U.S. Dist. Court Eastern Dist of N.Y., *Judge Joanna Seybert* https://www.nyed.uscourts.gov/content/judge-joanna-seybert (last visited Mar. 8, 2021).

16

50-year career by accepting a position as a trial attorney for the Legal Aid society of New York City after graduating from St. John's University School of Law in 1971.[5] She has served in a variety of positions throughout her career, including as a Senior Trial Attorney for the Federal Defender Services and the Bureau Chief for the Major Litigation Bureau for the Nassau County Attorney's Office.  She also served as a state court judge in Nassau County from 1987 to 1993 before her appointment by President Clinton.  According to her judicial profile, Judge Seybert is known for being an innovator "invested in the welfare of the Court as an institution and is selfless" in that regard.[6] It is unsurprising then that only a few years after joining the federal bench, Judge Seybert was selected to preside over a high-profile, multidistrict litigation against toy manufacturer Playmobil for price fixing.  *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 235 (E.D.N.Y. 1998) (certifying a class action against Playmobil, USA, Inc for violations of the Sherman Act).

Judge Seybert is also currently presiding over more Related Actions than any other judge in the Eastern District of New York.  Of the thirteen cases pending in the Eastern District of New York, five are assigned to Judge Seybert: *Baccari et. al. v. Hain Celestial Group, Inc.*, Case No. 2:21-cv-01076-JS-AYS; *Boyd v. Hain Celestial Group, Inc.*, Case No. 2:21-cv-00884-JS-AKT; *Bredberg et. al. v. The Hain Celestial Group, Inc.*, Case No. 2:21-cv-00758-JS-SIL; *Stewart et. al. v. Hain Celestial Group, Inc.*, Case No. 2:21-cv-00678-JS-AYS.  This list includes the earliest filed case in the Eastern District of New York, *Stewart et. al. v. Hain Celestial Group, Inc.*, which was filed on February 8, 2020.  Transfer to the docket to the Honorable Joanna Seybert would serve the interests of the litigation here.  Judge Seybert is a well-respected jurist with experience managing multidistrict litigation.

---

[5] *Id.*
[6] *See* Kathryn Carney Cole, *Hon. Joanna Seybert*, Judicial Profile, https://www.fedbar.org/wp-content/uploads/2019/10/SeybertFeb2011-pdf-3.pdf (last visited Mar. 8, 2021).

17

## IV. CONCLUSION

Albano Plaintiffs respectfully request that the Panel transfer the Related Actions, and any subsequent tag-along actions involving claims against the Defendants for manufacturing, marketing and selling baby foods with harmful heavy metals to the Eastern District of New York. The Eastern District of New York is particularly well-suited to handle the actions described herein, as well as any similar "tag along" cases subsequently filed.

Dated: March 5, 2021 

Respectfully submitted,

/s/ *Douglas J. McNamara*

Douglas J. McNamara
Geoffrey A. Graber
Brian E. Johnson
Paul M. Stephan
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
East Tower, 5th Floor
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:   (202) 408-4699
Email: dmcnamara@cohenmilstein.com
Email: ggraber@cohenmilstein.com
Email: bejohnson@cohenmilstein.com
Email: pstephan@cohenmilstein.com

Rosemary M. Rivas
Mark Troutman
Rosanne L. Mah
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
Email: rmr@classlawgroup.com
Email: mht@classlawgroup.com

*Attorneys for Plaintiffs Lori-Anne Albano, Myjorie Philippe, Rebecca Telaro, and Alyssa Rose*

18