JURY

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:21-cv-00321-LO-TCB

Hazely et al v. Gerber Products Company
Assigned to: District Judge Liam O'Grady
Referred to: Magistrate Judge Theresa Carroll Buchanan
Demand: $5,000,000
Cause: 28:1332 Diversity-Property Damage

Date Filed: 03/16/2021
Jury Demand: Plaintiff
Nature of Suit: 380 Personal Property: Other
Jurisdiction: Diversity

**Plaintiff**

**Crista Marie Hazely**
*on behalf of themselves and all others*
*similarly situated*

represented by **Christopher Wallace McDonald**
George Gesten McDonald, PLLC
5516 Falmouth Street
Suite 108
Richmond, VA 23230
804-256-2908
Fax: 888-421-4173
Email: cmcdonald@4-justice.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kathryn McCarthy**
*on behalf of themselves and all others*
*similarly situated*

represented by **Christopher Wallace McDonald**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Gerber Products Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/16/2021 | 1 | Complaint *against Gerber Products Company* ( Filing fee $ 402, receipt number 0422-7673970.), filed by Crista Marie Hazely, Kathryn McCarthy. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet)(McDonald, Christopher) (Entered: 03/16/2021) |
| 03/16/2021 | 2 | Proposed Summons *against Gerber Products Company* by Crista Marie Hazely, Kathryn McCarthy. (McDonald, Christopher) (Entered: 03/16/2021) |
| 03/16/2021 |  | Initial Case Assignment to District Judge Liam O'Grady and Magistrate Judge Theresa Carroll Buchanan. (aott, ) (Entered: 03/16/2021) |
| 03/16/2021 | 3 | Summons Issued as to Gerber Products Company. NOTICE TO ATTORNEY: Print out two electronically issued summons and one copy of the attachments for each defendant to be served with the complaint. (Attachments: # 1 Notice to Attorney)(aott) (Entered: 03/16/2021) |

**PACER Service Center**

**Transaction Receipt**

| 03/22/2021 16:57:26 | | | |
|---|---|---|---|
| **PACER Login:** | GeorgeGestenMcDonald:5984501:0 | **Client Code:** | BLB |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-00321-LO-TCB |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

**CRISTA MARIE HAZELY and KATHRYN MCCARTHY, on behalf of themselves and all others similarly situated,**

*Plaintiffs*,

v.

**GERBER PRODUCTS CO.,**

*Defendant.*

Case No. 1:21-cv-321

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs Crista Marie Hazely and Kathryn McCarthy ("Plaintiffs"), by and through their counsel, on their own behalf and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Gerber Products Company ("Gerber" or "Defendant") and allege the following facts in support of their claims against Defendant based upon personal knowledge, where applicable, information and belief, and the investigation of counsel:

### I.    INTRODUCTION

1.    Parents and other caregivers, including Plaintiffs, reasonably believe that the baby food they purchase for their babies will be healthy, nutritious, and non-toxic, and that is what Defendant wanted them to think. Alarmingly, parents and Plaintiffs were wrong. A recent report by the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform ("House Subcommittee") reveals that certain brands of commercial baby food – including Gerber products made with ingredients such as rice flour, sweet potatoes, certain juices, certain juice concentrates, and carrots, among other ingredients (the

"Tainted Baby Foods") – are tainted with significant and dangerous levels of toxic heavy metals, including arsenic, lead, cadmium, and mercury. *See Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium and Mercury*, Staff Report Dated February 4, 2021, Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform, U.S. House of Representatives (the "Congressional Report").[1] Exposure to toxic heavy metals causes permanent decreases in IQ and endangers neurological development and long-term brain function, among numerous other deleterious alarming conditions and problems.

2.     Plaintiffs bring this class action against Defendant for deceptive business practices, including misrepresentations and omissions, regarding the presence of dangerous levels of toxic heavy metals and other contaminants contained within their Gerber Tainted Baby Foods, including those that Plaintiffs purchased. Plaintiffs seek injunctive and monetary relief on behalf of the proposed Class including (i) requiring full disclosure of all such substances and ingredients in Defendant's marketing, advertising, and labeling; (ii) requiring testing of all ingredients and final products for such substances; and (iii) restoring monies to the members of the proposed Class.

3.     No reasonable consumer purchasing baby foods or seeing Defendant's representations in advertising would expect the baby foods to contain dangerous levels of heavy metals or other undesirable toxins or contaminants. Furthermore, reasonable consumers, like Plaintiffs, would consider the inclusion of dangerous levels of heavy metals or other undesirable toxins or contaminants a material fact when considering what baby food to purchase.

4.     Defendant intended for consumers to rely on its representations, and reasonable consumers did in fact so rely. However, Defendant's business practices, representations and omissions were deceptive, misleading, unfair, and/or false because, among other things, the

---

[1] Available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (last accessed March 15, 2021).

Tainted Baby Foods contained undisclosed dangerous levels of toxic heavy metals or other undesirable toxins or contaminants.

5.      Plaintiffs bring this proposed consumer class action individually and on behalf of all other members of the Class (as defined herein), who, from the applicable limitations period up to and including the present, purchased for personal/household use and not resale any of Defendant's Tainted Baby Foods. Through this action, Plaintiffs assert claims for unjust enrichment, and violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PS § 201 *et seq.*, and the Florida Deceptive and Unfair Trade Practices Act, §501.201 *et seq*. seeking monetary damages, injunctive relief, and all other relief as authorized in equity or by law.

## **Parties**

### *Plaintiffs*

6.      Plaintiff Crista Marie Hazely is a citizen and resident of the State of Florida, residing in Deltona, Florida in Volusia County.  During the applicable statute of limitations period, Plaintiff purchased Tainted Baby Foods that were manufactured and produced by Defendant that have been found to contain dangerous levels of toxic heavy metals, including Gerber Sweet Potato (Sitter 2nd Foods).

7.      Plaintiff Kathryn McCarthy is a citizen and resident of the State of Pennsylvania, residing in Export, Pennsylvania. During the applicable statute of limitations period, Plaintiff purchased Tainted Baby Foods that were manufactured and produced by Defendant that have been found to contain dangerous levels of toxic heavy metals, including Gerber Pasta Pick-Ups Chicken & Carrot Ravioli.

*Defendant Gerber*

8.      Defendant Gerber Products Company is a Michigan corporation with its principal place of business in Arlington, Virginia.  Gerber was purchased by Nestlé in 2007.  Gerber is a subsidiary of Nestlé S.A., and its sister company, Nestlé USA is incorporated in Delaware and headquartered in Arlington, Virginia.

9.      Defendant packages, labels, markets, advertises, formulates, manufactures, distributes, and sells its Tainted Baby Foods throughout the United States, including Pennsylvania and Florida.

10.     Defendant's logo is the iconic "Gerber Baby" featured on every jar. The Gerber Baby is intended to and does convey to consumers that Gerber is a trusted source of healthy foods for their babies. This symbol of health and safety in its baby foods has been Gerber's representation to consumers of its trustworthiness for decades. As Gerber states on its website regarding the sketch that became the Gerber Baby: "The image of this happy, healthy baby was soon to become the face that launched a brand, a face recognized and loved across the globe."[2] The website continues: "Indeed, the illustration became so popular that Gerber adopted it as its official trademark in 1931.  Since then, the Gerber Baby has appeared on all Gerber packaging andin every Gerber advertisement."[3]  In fact, Gerber states on its website that the Gerber Baby's "sparkling eyes and adorable, curious baby face still personify the Gerber brand, representing Gerber's commitment to happy, healthy babies all over the world."[4]

11.     On its website, Gerber touts its "Commitment to Quality," stating "Good enough is never enough": "We meet the standards of the FDA, but we don't stop there. We go further. We have among the strictest standards in the world. From farm to highchair, we go through over 100

---

[2] https://www.gerber.com/meet-the-gerber-baby (last accessed March 15, 2021).
[3] *Id*.
[4] *Id*.

quality checks for every jar."[5] Moreover, Defendant touts its "Commitment to Safety," representing: "Our team of experts are constantly looking at new ways of growing, testing, and making food that's healthy for baby and the environment."[6] The website further states: "Healthy for Baby" and represents: "The health and safety of your little one has been and will always be our highest priority. We're a leader in infant nutrition, not because we grow food that will simply feed your little one, but because we know what nourishment your little ones needs [sic]."[7]

12.     Based on the testing provided to Congress (which did not encompass all of the ingredients used by Defendant), Defendant's tainted ingredients include rice flour, sweet potatoes, certain juices, certain juice concentrates, and carrots.[8]  The Congressional Report concludes that all or a large portion of the products made with such ingredients contain dangerous levels of toxic heavy metals.

### Jurisdiction and Venue

13.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d)(2), because at least one Class Member is of diverse state citizenship from Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

14.     The Eastern District of Virginia has general jurisdiction and personal jurisdiction over Defendant, as Defendant is headquartered in this District and conducts substantial business in this State and in this District through its headquarters, sale of products, and commercial website.

15.     Venue is proper in this District under 28 U.S.C. §1391 because a substantial part

---

[5] https://www.gerber.com/commitment-to-quality (last accessed March 15, 2021).
[6] *Id.*
[7] *Id.*
[8] Gerber, Gerber Products Company Test Results (Dec. 9, 2019 (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/5_0.pdf)) (last accessed March 15, 2021) (noting these ingredients, including apple juice concentrate, grape juice white concentrate and pear juice concentrate).

of the events, misrepresentations and/or omissions giving rise to the conduct alleged in this Complaint occurred in and were directed to this District, and because Defendant is headquartered in this District.

## II.    FACTUAL ALLEGATIONS

### Congressional Investigation Finds Dangerous Levels of Heavy Metals in Baby Foods

16.    On February 4, 2021, the House Subcommittee issued its Congressional Report detailing its findings that heavy metals, including arsenic, cadmium, lead, and mercury ("Heavy Metals"), were present in dangerously "significant levels" in numerous commercial baby food products.

17.    The Food and Drug Administration (the "FDA") and the World Health Organization ("WHO") have declared Heavy Metals dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects. Even low levels of exposure can cause serious and often irreversible damage to brain development. *See* Congressional Report at 2. In fact, children's exposure to toxic heavy metals causes, among other things, permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior.[9] *See id*. at 9.  The FDA cautions that infants and children are at the greatest risk of harm from toxic heavy metal exposure.[10]

18.    On November 6, 2019, following reports alleging high levels of toxic heavy metals in baby foods, the House Subcommittee requested internal documents and test results from seven of the largest manufacturers of baby food in the United States, including both makers of organic

---

[9] Miguel Rodriguez-Barranco et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioral Disorders in Children: A Systematic Review and Meta-Analysis* (April 9, 2013) (*available at* www.sciencedirect.com/science/article/abs/pii/S0048969713003409?via%3Dihub (last accessed March 15, 2021).

[10] Food and Drug Administration, *Metals and Your Food* (www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food (last accessed March 15, 2021).

and conventional products. *See id*. at 2. One of those companies was Defendant, which sells Gerber baby food products. *See id*.

19.  Defendant responded to the House Subcommittee's requests and produced its internal testing policies, test results for ingredients and/or finished products, and documentation about what it did with ingredients and/or finished products that exceeded its internal testing limits. *See id*.

20.  The FDA and other organizations have set rules and/or issued guidelines and recommendations as to the maximum allowable or advisable and safe levels in various different types of products of inorganic arsenic, lead, cadmium and mercury. *See generally id*. at Point II. In many instances, the test results of Defendant's baby foods and their ingredients eclipse those levels for inorganic arsenic, lead, cadmium and mercury.  *See id*. at Findings, at 2-5.

**Arsenic**

*21.*  As per the Congressional Report, arsenic is ranked as number one for "substances present in the environment that pose the most significant potential threat to human health, according to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry (ATSDR)." *Id*. at 10. Arsenic exposure has severe health risks, including damage to the central nervous system and cognitive development in children. *See id.* Full Scale IQ is severely negatively affected in children for verbal and performance domains and memory. *See id.* One study concluded that 5 ppb of arsenic in drinking water caused children to have significant reductions in Full Scale IQ and other related scores. *See id.*

22.  The Congressional Report further states, "There is no established safe level of inorganic arsenic consumption for babies." *Id.* at 13. While certain organizations such as Healthy Babies Bright Futures contend that there should be a goal of no measurable inorganic arsenic in baby food, Consumer Reports suggests it should be no more than 3 ppb. *See id.*  For bottled water,

the FDA has set the maximum inorganic arsenic level at 10 ppb and the EPA has set a 10 ppb cap on drinking water, as have the European Union (EU) and WHO. *See id.* The FDA has only set one final standard to date, which is a 100 ppb limit for inorganic arsenic for infant rice cereal. *See id.* at 37.

23.     According to the Congressional Report, Defendant did not provide inorganic arsenic results for all of the ingredients it uses but conventional rice flour results showed Defendant routinely used such flour containing over 90 ppb inorganic arsenic, with many batches that had 98 ppb. *See id.* at 19.

### **Lead**

*24.*     The Congressional Report noted that lead is number two on ATSDR's list of substances that pose the most serious threat to human health. *See id.* at 11.  Even small amounts of exposure are dangerous, especially for children, and can cause behavioral issues, decreased cognitive performance, delayed puberty, and reduced postnatal growth. *See id.* Early childhood lead exposure negatively affects school performance and test scores. *See id.* These effects can be permanent. *See id.*

*25.*     As the Congressional Report states, "There is a growing consensus among health experts that lead levels in baby foods should not exceed 1 ppb." *Id.* at 21. In other products, the FDA set a 5 ppb lead standard for bottled water; the WHO set a 10 ppb provisional guideline for drinking water; the EPA set an action level of 15 ppb in drinking water; the FDA set standards for juice at 50 ppb and candy at 100 ppb; and the EU set a maximum level of 20 ppb in infant formula. *See id.*

26.     According to the Congressional Report, Defendant's "results for its sweet potatoes and juices demonstrated its willingness to use ingredients that contained dangerous lead levels." *Id.* at 27. In fact, "Gerber used an ingredient, conventional sweet potatoes, with 48 ppb lead.

Gerber also used twelve other batches of sweet potatoes that tested over 20 ppb for lead, the EU's lenient upper standard." *Id.* Moreover, "[t]he average amount of lead in Gerber's tested juice concentrates was 11.2 ppb – more than FDA's limit for lead in bottled water. Over 83% of the juice concentrates tested showed greater than 1 ppb lead, which is Consumer Reports' recommended limit for fruit juices." *Id.*

**Cadmium**

27.     The Congressional Report states that cadmium is seventh on ATSDR's list of substances in the environment that pose the most serious threat to human health. *See id.* at 12. Cadmium has been associated with decreases in IQ and ADHD. *See id.*

28.     Outside of baby foods, the EPA has a 5 ppb limit for drinking water; the FDA has a 5 ppb limit for bottled water; and the WHO has a 3 ppb limit for drinking water. *See id.* at 29. Healthy Babies Bright Futures contends there should be no measurable cadmium in baby food and Consumer Reports' position is there should be a limit of 1 ppb cadmium in fruit juices. *See id.* The EU set a limit from 5-20 ppb cadmium for infant formula. *See id.*

29.     The Congressional Report stated that while Gerber does not test all of its ingredients for cadmium, of the ingredients it does test "it accepts ingredients with high levels of cadmium. Gerber used multiple batches of carrots containing as much as 87 ppb cadmium, and 75% of the carrots Gerber used had more than 5 ppb cadmium – the EPA's drinking water standard." *Id.* at 32.

**Mercury**

30.     According to the Congressional Report, Mercury is third on the ATSDR's list of substances in the environment that pose the most serious threat to human health. *See id.* at 12. Studies have shown that higher blood mercury levels in children 2 to 3 years old were associated with autistic behaviors among preschool age children. *See id.* at 12-13.

9

*31.*     Outside of the baby food context, the EPA limits mercury in drinking water to 2 ppb. *See id.* at 32.  Healthy Babies Bright Futures contends there should be no measurable mercury in baby food. *See id.*

*32.*     The Congressional Report stated, "Gerber barely tests for mercury." *Id.* at 33. In fact, "Gerber only tests certain ingredients for mercury. Of the test results they presented to the Subcommittee, they only tested carrots, sweet potatoes, and lemon juice concentrate." *Id.*

33.     The Congressional Report concluded that, among other companies, Gerber showed a "reckless disregard for the health of babies." *Id.* at 43. For example, the fact that Gerber has a policy to regularly only test ingredients and only periodically test finished goods, this "policy recklessly endangers babies and children and prevents the companies from even knowing the full extent of the danger presented by their products." *Id.* at 56-57. The Congressional Report explained that Gerber used rice flour with over 90 ppb inorganic arsenic and because rice and rice flour constitute a large proportion by volume of the baby foods that contain such ingredients, "increased toxic heavy meatal levels in rice and rice flour could have a significant impact on the safety of the finished product." *Id.* at 58.

34.     Baby foods containing dangerous levels of toxic Heavy Metals bear no label or warning to parents. But the Congressional Report makes clear that this is unacceptable and deceptive. *See id.* at 59.

35.     As a result of its studies of toxic Heavy Metal levels in baby food, the House Subcommittee has recommended that parents should avoid baby foods that contain ingredients testing high in toxic Heavy Metals, such as rice products. *See id*. at Findings, Paragraph 5.

36.     Baby food manufacturers hold a special position of public trust.  Consumers believe that they would not sell products that are unsafe. Consumers also believe that the federal government would not knowingly permit the sale of unsafe baby food.  As the House

Subcommittee's Report reveals, baby food manufacturers, including Defendant, have violated the public trust. *See id.* at Findings, Paragraph 6.

37.     Despite the dangerous levels of toxic and Heavy Metals that Defendant knows to be contained in its Tainted Baby Foods, as noted above, on its website, Defendant falsely represents to parents that it has a strong commitment to health and nutrition as well as the quality and safety of its baby products. The iconic logo, the Gerber Baby, smiles at every consumer on every single product, representing that Gerber baby food is safe and nutritious. This representation is materially false and misleading given the presence of dangerous amounts of toxic Heavy Metals in the Tainted Baby Foods. On its website, Gerber touts its "Commitment to Quality," stating "Good enough is never enough": "We meet the standards of the FDA, but we don't stop there. We go further. We have among the strictest standards in the world. From farm to highchair, we go through over 100 quality checks for every jar." Moreover, Defendant touts its "Commitment to Safety," representing: "Our team of experts are constantly looking at new ways of growing, testing, and making food that's healthy for baby and the environment." The website further states: "Healthy for Baby" and represents: "The health and safety of your little one has been and will always be our highest priority. We're a leader in infant nutrition, not because we grow food that will simply feed your little one, but because we know what nourishment your little ones needs [sic]." Each of these statements is materially false and misleading given Defendant's sales of its Tainted Baby Foods.

38.     Moreover, most of Defendant's packaging contains further false and misleading representations such as "Made with the goodness of" and "The goodness inside." For example, a package of Gerber Sweet Potato Turkey (Sitter 2nd Foods) says on the package: "Made with the goodness of" and includes sweet potatoes, but the Congressional Report concluded that Gerber produced test results for lead showing that its "results for its sweet potatoes … demonstrated its

willingness to use ingredients that contained dangerous lead levels." Congressional Report at 27. Similarly, a package of Gerber Carrots (Sitter 2nd Foods) says on the package: "The goodness inside:" and states that this ingredient is carrots, but the Congressional Report concluded that Gerber produced test results for cadmium that showed "it accepts ingredients with high levels of cadmium," such as carrots. *Id.* at 32. The same language appears on the package of Gerber Sweet Potato (Sitter 2nd Foods) regarding the contents of sweet potatoes. The Gerber pouch products state on the package that they contain "Simply the good stuff," such as the Apple Carrot Squash. Rather than containing "Goodness" or "Simply the good stuff," these products contain dangerous levels of toxic Heavy Metals.

39.     Based on Defendant's decision to advertise, label, and market its Tainted Baby Foods as healthy, nutritious, and safe for consumption, it had a duty to ensure that these and other statements were true and not misleading, which it failed to do.

40.     The Tainted Baby Foods are available at numerous retail and online outlets. However, as discussed above, Defendant fails to disclose they contain or are at risk of containing dangerous levels of Heavy Metals or other undesirable toxins or contaminants. Defendant intentionally omitted these contaminants to induce and mislead reasonable consumers to purchase its Tainted Baby Foods.

### III.     CLASS ACTION ALLEGATIONS

41.     Pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this class action on behalf of themselves and a nationwide Class defined as:

> **All persons who, during the applicable statute of limitation period to the present, purchased Defendant's Tainted Baby Foods in the United States for personal/household use, and not for resale (the "Class" or "Nationwide Class").**

42. Plaintiff Hazely also seeks to represent a subclass (the "Florida Subclass"), defined as follows:

> **All persons who, during the applicable statute of limitation period to the present, purchased Defendant's Tainted Baby Foods in Florida for personal/household use, and not for resale.**

43. In addition, Plaintiff McCarthy also seeks to represent a subclass (the "Pennsylvania Subclass"), defined as follows:

> **All persons who, during the applicable statute of limitation period to the present, purchased Defendant's Tainted Baby Foods in Pennsylvania for personal/household use, and not for resale.**

44. Certification of Plaintiffs' claims for class-wide treatment is appropriate because all elements of Fed. R. Civ. P. 23(a), (b)(2)-(3) are satisfied. Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in an individual action alleging the same claims.

45. **Numerosity:** All requirements of Fed. R. Civ. P. 23(a)(l) are satisfied. The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs. Plaintiffs believe that the identity of Class members is known or knowable by Defendant or can be discerned through reasonable means. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

46. **Commonality and Predominance:** All requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) are satisfied. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.   whether Defendant engaged in the deceptive and misleading business practices alleged herein;

b.   whether Defendant knew or should have known that the Tainted Baby Foods contained dangerous levels of Heavy Metals;

c.   whether Defendant represented and continues to represent that the Tainted Baby Foods are healthy, nutritious, made from the best ingredients, and safe for consumption;

d.   whether Defendant represented and continues to represent that the manufacturing of its Tainted Baby Foods is subjected to rigorous quality standards;

e.   whether Defendant failed to disclose that the Tainted Baby Foods contained dangerous levels of Heavy Metals;

f.   whether Defendant had knowledge that those representations were false, deceptive, and misleading and was unjustly enriched by its actions;

g.   whether Defendant continues to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

h.   whether the misrepresented and/or omitted facts are material to a reasonable consumer;

i.   whether Defendant violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PS § 201 *et seq.*;

j.   whether Defendant violated Florida's Deceptive and Unfair Trade Practices Act;

k.   whether Plaintiffs and members of the Class were injured and suffered damages;

      l.  whether Defendant's misconduct proximately caused Plaintiffs' and the Class members' injuries; and

      m.  whether Plaintiffs and members of the Class are entitled to damages and, if so, the measure of such damages.

47.   **Typicality:** All requirements of Fed. R. Civ. P. 23(a)(3) are satisfied. Plaintiffs are members of the Nationwide Class and Pennsylvania or Florida Subclasses, having purchased for personal/household use Tainted Baby Food products that were manufactured by Defendant. Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendant's conduct.

48.   **Adequacy of Representation:** All requirements of Fed. R. Civ. P. 23(a)(4) are satisfied. Plaintiffs are adequate Class representatives because they are members of the Nationwide Class and Pennsylvania or Florida Subclasses and their interests do not conflict with the interests of the other members of the Class that they seek to represent. Plaintiffs are committed to pursuing this matter for the Class with the Class's collective best interests in mind. Plaintiffs have retained counsel competent and experienced in complex class action litigation of this type and Plaintiffs intend to prosecute this action vigorously. Plaintiffs, and their counsel, will fairly and adequately protect the Class's interests.

49.   **Predominance and Superiority:** All requirements of Fed. R. Civ. P. 23(b)(3) are satisfied. As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiffs' individual cases will also resolve them for the Class's claims. In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense

that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

50. **Cohesiveness:** All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied. Defendant has acted, or refused to act, on grounds generally applicable to the Class making final declaratory or injunctive relief appropriate.


## IV. CAUSES OF ACTION

### COUNT I
**Violations of Pennsylvania Unfair Trade Practices and Consumer Protection Law
73 PS § 201 *et seq.*
(On Behalf of Plaintiff McCarthy and the Pennsylvania Subclass)**

51. Plaintiff McCarthy, individually and on behalf of the Pennsylvania Subclass, repeats and re-alleges the allegations contained in paragraphs 1 through 50 as though fully set forth herein.

*52.* Gerber, Plaintiff McCarthy and the Pennsylvania Subclass are "[p]erson[s]" within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "UTPCPL") 73 PS § 201-2, *et seq.*

53. The Pennsylvania UTPCPL declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce …."

54. The UTPCPL at 73 P.S. § 201-2 prohibits the following conduct: "(vii)

Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another."

55.     Defendant engaged in, and continues to engage in, the above-referenced deceptive acts and unfair trade practices in the conduct of business, trade, and commerce, including by misrepresenting and omitting material facts regarding its Tainted Baby Foods. Defendant's Tainted Baby Foods contain unhealthy and dangerous levels of Heavy Metals. Defendant knew or should have known that its Tainted Baby Foods should not contain these levels of Heavy Metals and/or at the amounts found therein and that by manufacturing and providing for commercial sale baby food with toxic levels of Heavy Metals, Plaintiff McCarthy and the Pennsylvania Subclass members were not getting healthy and/or nutritious food to help their children grow strong.

56.     Plaintiff McCarthy relied on Defendant's deceptive acts, unfair trade practices, material misrepresentations and omissions, which are described above. Plaintiff McCarthy has suffered injury in fact and lost money as a result of Defendant's unlawful, unfair, and fraudulent practices.

57.     Defendant's wrongful conduct caused Plaintiff McCarthy and the Pennsylvania Subclass to suffer an ascertainable loss by causing them to incur substantial expense in purchasing the Tainted Baby Foods which they reasonably believed were safe and nutritious for their babies when these products contained dangerous levels of toxic Heavy Metals. Plaintiff McCarthy and the Pennsylvania Subclass have suffered an ascertainable loss by receiving less than what was promised.

58.     Plaintiff McCarthy and the Pennsylvania Subclass members would not have purchased the Tainted Baby Foods at issue for their children had they known the truth about the presence of dangerous levels of toxic Heavy Metals.  There is no other use for Defendant's tainted

products.

59.     Defendant's actions described herein constitute fraud within the meaning of the UTPCPL § 201 *et seq.* by using dangerous levels of toxic Heavy Metals and failing to properly represent, both by affirmative conduct and by omission, the nutritional value and safety of Defendant's Tainted Baby Foods. Defendant's actions were likely to mislead Plaintiff McCarthy and the Pennsylvania Subclass into believing the products were safe, healthy and nutritious when they in fact contained dangerous levels of toxic Heavy Metals.

60.     If Defendant had not sold baby food tainted with dangerous levels of Heavy Metals, Plaintiff McCarthy and the other Pennsylvania Subclass members would not have suffered the extent of damages caused by Defendant's sales.

61.     Defendant's violations present a continuing risk to Plaintiff McCarthy and the Pennsylvania Subclass, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest and are highly likely to deceive a substantial portion of the consuming public.

62.     As a direct and proximate result of Defendant's business practices, Plaintiff McCarthy and the Pennsylvania Subclass members suffered injury in fact and lost money or property because they purchased and paid for products they otherwise would not have. Plaintiff McCarthy and the Pennsylvania Subclass members are entitled to injunctive relief and attorneys' fees and costs.

63.     Pursuant to Pennsylvania UTPCPL § 201-4.1, Plaintiff McCarthy and the Pennsylvania Subclass members seek an order of this Court requiring Defendant to disgorge all ill-gotten gains and awarding Plaintiff McCarthy and the Pennsylvania Subclass members full restitution of all monies wrongfully acquired by it by means of such "unlawful" and "unfair" conduct, so as to restore any and all monies to Plaintiff McCarthy and the Pennsylvania Subclass

members which were acquired and obtained by such "unlawful" and "unfair" conduct, and which ill-gotten gains are still retained by Defendant.

64.     Plaintiff McCarthy and the Pennsylvania Subclass members are entitled to treble actual damages of not less than $100, plus reasonable attorneys' fees and costs. 73 P. S. **§** 201-9.2.

**COUNT II**
**Violations of Florida's Deceptive and Unfair Trade Practices Act § 501.201 *et seq.***
**(On Behalf of Plaintiff Hazely and the Florida Subclass)**

65.     Plaintiff Hazely, individually and on behalf of the Florida Subclass, repeats and re-alleges the allegations contained in paragraphs 1 through 50 as though fully set forth herein.

66.     Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.204(1). Defendant participated in unfair, unconscionable and deceptive trade practices that violated FDUTPA as described herein.

67.     Plaintiff Hazely, individually, and the members of the Florida Subclass are "consumers" within the meaning of Florida Stat. § 501.203(7).

68.     Defendant engaged in "trade or commerce" within the meaning of Florida Stat. § 501.203(8).

69.     Defendant's Tainted Baby Foods contain unhealthy and dangerous levels of Heavy Metals.  Defendant knew or should have known that its baby food should not contain these dangerous levels of Heavy Metals and that by manufacturing and providing for commercial sale baby food with toxic levels of Heavy Metals, Plaintiff Hazely and the Florida Subclass members were not getting healthy and/or nutritious food to help their children grow strong.

70.     Plaintiff Hazely and the Florida Subclass members would not have purchased the

baby food at issue for their children had they known the truth about the presence of toxic Heavy Metals. There is no other use for Defendant's tainted products.

71.     Defendant violated the FDUPTA by, among other things, using dangerous levels of toxic Heavy Metals and failing to properly represent, both by affirmative conduct and by omission, the nutritional value and safety of Defendant's baby foods.

72.     If Defendant had not sold baby food tainted with dangerous levels of Heavy Metals, Plaintiff Hazely and the other Florida Subclass members would not have suffered the extent of damages caused by Defendant's sales.

73.     Defendant's practices, acts, policies and course of conduct violate FDUPTA in that Defendant used dangerous levels of toxic Heavy Metals in its Tainted Baby Foods and actively and knowingly misrepresented or omitted disclosure of material information to Plaintiff Hazely and the Florida Subclass members at the time they purchased the Tainted Baby Foods, including the fact that Defendant's products contained dangerous levels of toxic Heavy Metals. Defendant also failed to disclose and give timely warnings or notices regarding the presence of dangerous levels of toxic Heavy Metals in its baby food products that were purchased by Plaintiff Hazely and the Florida Subclass members.

74.     The aforementioned conduct constitutes an unconscionable commercial practice in that Defendant has, by engaging in the use of dangerous levels of toxic Heavy Metals and the use of false statements and/or material omissions, failed to properly represent and/or concealed the presence of unacceptable dangerous levels of Heavy Metals in its Tainted Baby Foods.

75.     Members of the public, including Plaintiff Hazely and the members of the Florida Subclass, were deceived by and relied upon Defendant's actions, affirmative misrepresentations and failures to disclose.

76.     Such acts and practices by Defendant are and were likely to mislead a reasonable

consumer purchasing baby food from Defendant. Said acts and practices are material. The sales of Defendant's Tainted Baby Foods in Florida through such means occurring in Florida were consumer-oriented acts and thereby fall under the FDUTPA.

77.     As a direct and proximate cause of Defendant's conduct, Plaintiff Hazely and the Florida Subclass members suffered damages as alleged above.

78.     Defendant's conduct described above also amounts to unfair business practices, which are immoral, unethical, oppressive and unscrupulous.

79.     As a result of Defendant's conduct alleged herein, Plaintiff Hazely individually and the members of the Florida Subclass have suffered actual damages in that they have paid excessive and artificially prices for Defendant's Tainted Baby Food as a result of Defendant's unlawful, unfair, and deceptive practices and are entitled to damages.

80.     As a result of the aforementioned conduct, Plaintiff Hazely individually, and the members of the Florida Subclass, are entitled to permanent injunctive relief to prevent Defendant from continuing to engage in these unfair and deceptive trade practices.

81.     Pursuant to Florida Statute § 501.2105, Plaintiff Hazely, individually, and as a member of the Florida Subclass, is entitled to recover costs and reasonable attorneys' fees in this action.

## COUNT III
### Unjust Enrichment
### (On Behalf of All Plaintiffs and the Nationwide Class)

82.     Plaintiffs, individually and on behalf of the Class, repeat and re-allege the allegations contained in paragraphs 1 through 50 as though fully set forth herein.

83.     Plaintiffs and Class members conferred a monetary benefit on Defendant. Specifically, they purchased baby food from Defendant and provided Defendant with their monetary payment. In exchange, Plaintiffs and Class members should have received from

Defendant goods and services that were healthy and nutritious and not tainted with dangerous levels of Heavy Metals.

84.     Defendant knew that Plaintiffs and Class members conferred a benefit on them and accepted or retained that benefit. Defendant profited from Plaintiffs' purchases and used Plaintiffs and Class members' monetary payments for business purposes.

85.     Defendant failed to disclose to Plaintiffs and Class members that its Tainted Baby Foods were unhealthy and contained dangerous levels of Heavy Metals and did not provide product that Plaintiffs and Class members were promised.

86.     If Plaintiffs and Class members knew that Defendant's Tainted Baby Foods were unhealthy and toxic as alleged herein, they would not have purchased Defendant's Tainted Baby Foods.

87.     Plaintiffs and Class members have no adequate remedy at law.

88.     Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class members conferred on them.

89.     Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds that they unjustly received from them.  In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class members overpaid.

## VI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court:

a)     Certify the Nationwide Class, including the Pennsylvania and Florida Subclasses, and appoint Plaintiffs and their counsel to represent the Nationwide Class and Pennsylvania and Florida Subclasses;

b)   Find that Defendant engaged in the unlawful conduct as alleged herein and enjoin Defendant from engaging in such conduct;

c)   Enter a monetary judgment in favor of Plaintiffs and the Class, including the Pennsylvania and Florida Subclasses, to compensate them for the injuries suffered, together with pre-judgment and post-judgment interest, punitive damages, and penalties where appropriate;

d)   Require Defendant to rectify all damages caused by its misconduct;

e)   Award Plaintiffs and the Class, including the Pennsylvania and Florida Subclasses, reasonable attorneys' fees and costs of suit, as allowed by law; and

f)   Award such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  March 15, 2021                        Respectfully submitted,

*/s/ Christopher W. McDonald*
Christopher W. McDonald, Esq.
VA Bar No. 33092
Attorney for Crista Marie Hazely and
Kathryn McCarthy
**GEORGE GESTEN MCDONALD, PLLC**
5516 Falmouth Street, Suite 108
Richmond, VA 23230
Phone: (804) 256-2908
Fax: (888) 421-4173
Email: CMcDonald@4-Justice.com
E-Service: eService@4-Justice.com

David J. George, Esq.
**GEORGE GESTEN MCDONALD, PLLC**
9897 Lake Worth Road, Suite #302
Lake Worth, FL 33467
Phone: (561) 232-6002
Fax: (888) 421-4173
Email: DGeorge@4-Justice.com

Lori G. Feldman, Esq.
**GEORGE GESTEN MCDONALD, PLLC**
102 Half Moon Bay Drive
Croton-on-Hudson, New York 10520
Phone: (917) 983-9321
Fax: (888) 421-4173
Email: LFeldman@4-justice.com
E-Service: eService@4-Justice.com

Janine L. Pollack, Esq.
**CALCATERRA POLLACK LLP**
1140 Avenue of the Americas, 9th Floor
New York, New York 10036
Phone: (917) 899-1765
Fax: (332) 206-2073
Email: jpollack@calcaterrapollack.com

*Counsel for Plaintiffs*