# U.S. District Court
## Eastern District of California - Live System (Fresno)
## CIVIL DOCKET FOR CASE #: 1:21-cv-00266-NONE-SKO

Baker v. Beech-Nut Nutrition Corporation
Assigned to: UnassignedDJ
Referred to: Magistrate Judge Sheila K. Oberto
Cause: 28:1332 Diversity-Fraud

Date Filed: 02/25/2021
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

### Plaintiff

**Shelby Baker**
*on behalf of herself and all others similarly
situated*

represented by **Joel Dashiell Smith**
Bursor & Fisher, P.A.
1990 North California Blvd.
Suite 940
Walnut Creek, CA 94596
925-300-4455
Fax: 925-407-2700
Email: jsmith@bursor.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Blair Elizabeth Reed**
Bursor and Fisher, P.A.
1990 North California Blvd.
Suite 940
Walnut Creek, CA 94596
925-300-4455
Fax: 925-407-2700
Email: breed@bursor.com
*ATTORNEY TO BE NOTICED*

**Lawrence Timothy Fisher**
Bursor and Fisher, PA
1990 N. California Blvd.
Suite 940
Walnut Creek, CA 94596
925-300-4455
Fax: 925-407-2700
Email: ltfisher@bursor.com
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**Beech-Nut Nutrition Corporation**

represented by **Peter Hsiao**
KING & SPALDING
633 W Fifth Street
Suite 1600
Los Angeles, CA 90071

2134434379
Fax: 2134434310
Email: phsiao@kslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cory L. Burleson**
King & Spalding LLP
633 W. 5th Street
Los Angeles, CA 90071
213-443-4395
Email: cburleson@kslaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Hain Celestial Group, Inc.**

**Defendant**

**Gerber Products Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/25/2021 | 1 | COMPLAINT against Beech-Nut Nutrition Corporation by Shelby Baker. Attorney Smith, Joel Dashiell added. (Filing fee $ 402, receipt number 0972-9439057) (Attachments: # 1 Civil Cover Sheet)(Smith, Joel) (Entered: 02/25/2021) |
| 02/25/2021 | 2 | SUMMONS ISSUED as to *Beech-Nut Nutrition Corporation* with answer to complaint due within *21* days. Attorney *Joel Dashiell Smith* *Bursor & Fisher, P.A.* *1990 North California Blvd., Suite 940* *Walnut Creek, CA 94596*. (Jessen, A) (Entered: 02/25/2021) |
| 02/25/2021 | 3 | CIVIL NEW CASE DOCUMENTS ISSUED: Initial Scheduling Conference set for 5/18/2021 at 09:45 AM in Courtroom 7 (SKO) before Magistrate Judge Sheila K. Oberto. (Attachments: # 1 Standing Order, # 2 Standing Order re Judicial Emergency, # 3 Consent Form, # 4 VDRP) (Jessen, A) (Entered: 02/25/2021) |
| 03/18/2021 | 4 | FIRST AMENDED COMPLAINT against Beech-Nut Nutrition Corporation, Hain Celestial Group, Inc., Gerber Products Company by Shelby Baker.(Smith, Joel) (Entered: 03/18/2021) |
| 03/19/2021 | 5 | SUMMONS ISSUED as to *Gerber Products Company, Hain Celestial Group, Inc.* with answer to complaint due within *21* days. Attorney *Joel Dashiell Smith* *Bursor & Fisher, P.A.* *1990 North California Blvd., Suite 940* *Walnut Creek, CA 94596*. (Jessen, A) (Entered: 03/19/2021) |
| 03/31/2021 | 6 | NOTICE of APPEARANCE by Peter Hsiao on behalf of Beech-Nut Nutrition Corporation. Attorney Hsiao, Peter added. (Hsiao, Peter) (Entered: 03/31/2021) |
| 03/31/2021 | 7 | NOTICE of APPEARANCE by Cory L. Burleson on behalf of Beech-Nut Nutrition Corporation. Attorney Burleson, Cory L. added. (Burleson, Cory) (Entered: 03/31/2021) |
| 03/31/2021 | 8 | CORPORATE DISCLOSURE STATEMENT by Defendant Beech-Nut Nutrition Corporation. (Burleson, Cory) (Entered: 03/31/2021) |

**PACER Service Center**

| **Transaction Receipt** | | | |
|---|---|---|---|
| 04/05/2021 06:57:48 | | | |
| **PACER Login:** | sbursor1:2630502:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-00266-NONE-SKO |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

1

2

3

4

5

6

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
         jsmith@bursor.com
         breed@bursor.com

7

*Attorneys for Plaintiff*

8

9

10

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

11

12

13

14

15

16

17

18

SHELBY BAKER, on behalf of herself and all
others similarly situated,

                        Plaintiff,

        v.

HAIN CELESTIAL GROUP, INC., BEECH-
NUT NUTRITION CORPORATION, and
GERBER PRODUCTS COMPANY,

                        Defendants.

Case No. 1:21-cv-00266

**FIRST AMENDED CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

19

20

21

22

23

24

25

26

27

28

1      Plaintiff Shelby Baker ("Plaintiff"), individually and on behalf of all others similarly

2   situated, alleges the following against Defendants Hain Celestial Group, Inc. ("Hain"), Beech-Nut

3   Nutrition Corporation ("Beech-Nut"), and Gerber Products Company ("Gerber") (collectively,

4   "Defendants") on information and belief, except that Plaintiff's allegations as to her own actions

5   are based on personal knowledge.

6                              **NATURE OF THE ACTION**

7      1.      This action seeks to recover damages and remedy Defendants' continuing failure to

8   warn individuals that Hain's Earth's Best Baby Food, Beech-Nut Baby Food and Gerber's Baby

9   Food (collectively, the "Products")[1] expose consumers to heightened levels of toxic heavy metals,

10   including lead, arsenic, cadmium, and/or mercury.

11      2.      A February 2021 report by the U.S. House of Representatives' Subcommittee on

12   Economic and Consumer Policy, Committee on Oversight and Reform ("House Subcommittee")

13   reveals that certain brands of commercial baby food – including Defendants' Products – are tainted

14   with significant levels of toxic heavy metals.

15      3.      Heightened levels of toxic heavy metals in foods can cause cancer and serious and

16   often irreversible damage to brain development as well as other serious health problems.

17      4.      As described more fully below, consumers who purchase the Products are injured

18   by Defendants' acts and omissions concerning the presence of heightened levels of toxic heavy

19   metals.  No reasonable consumer would know, or have reason to know, that the Products contain

20   heightened levels of heavy metals.  As such, Plaintiff seeks relief in this action individually and as

21   a class action on behalf of all purchasers of the baby food Products.

22                                    **PARTIES**

23      5.      Plaintiff Shelby Baker is a resident of Bakersfield, California and a citizen of the

24   State of California.  Ms. Baker has purchased Earth's Best, Beech-Nut, and Gerber baby food

---

[1] The baby foods at issue include, at minimum, the following:  Hain's Earth's Best Whole Grain
Rice Cereal, Whole Grain Oatmeal Cereal, and Sweet Potatoes Organic Baby Food; Beech-Nut's
Rice Single Grain Baby Cereal, Classic Sweet Potatoes, Naturals Just Sweet Potatoes, and Classic
Mixed Vegetables; and Gerber's Puffs, Lil' Crunchies, and Yogurt Melts (referred to herein as
"Gerber Products").

FIRST AMENDED CLASS ACTION COMPLAINT                                          1
CASE NO. 1:21-CV-00266

Products for household use within the last two to six months. Had Defendants disclosed on the label that those products contained high levels of toxic heavy metals, Ms. Baker would have been aware of that fact and would not have purchased the products. After learning of the high levels of toxic heavy metals, Ms. Baker stopped purchasing the products. However, Ms. Baker regularly visits stores where Defendants' products are sold and remains interested in purchasing healthy, safe baby food for her children. She would consider purchasing Defendants' Products in the future if Defendants removed the heightened levels of toxic heavy metals.

6.     Defendant Hain Celestial Group, Inc. is a citizen of Delaware, where it is incorporated, and New York because it maintains its principal place of business at 111 Marcus Avenue, Lake Success, New York. Hain manufactures, markets, and sells "Earth's Best" baby food products throughout the United States.

7.     Defendant Beech-Nut Nutrition Corporation is a foreign corporation with its headquarters in Amsterdam, New York. Beech-Nut manufactures, markets, and sells Beech-Nut baby food products throughout the United States.

8.     Defendant Gerber Products, Co. is a citizen of Delaware, where it is incorporated, and Virginia because it maintains its principal place of business at 1812 N. Moore St. Arlington, VA 22209. Gerber manufactures, markets, and sells its baby food products throughout the United States.

## JURISDICTION AND VENUE

9.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from Defendants.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants conduct business throughout this district, and a substantial part of the events giving rise to Plaintiff's claims took place within this District. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## FACTS COMMON TO ALL CAUSES OF ACTION

### I. Lead, Arsenic, Cadmium, And Mercury Are Toxic

11.     The harmful effects of heavy metals are well-documented, particularly on children. Exposure puts children at risk for lowered IQ, behavioral problems (such as attention deficit hyperactivity disorder), type 2 diabetes, and cancer, among other health issues.  Heavy metals pose risks to adults.  Even modest amounts of heavy metals can increase the risk of cancer, cognitive and reproductive problems, and other adverse conditions.  Because the average person comes into contact with heavy metals many times and from many sources, it is important to limit exposure, particularly with respect to children.

12.     Lead can affect almost every organ and system in the body.  Lead accumulates in the body over time, and can lead to health risks and toxicity, including inhibiting neurological function, anemia, kidney damage, seizures, and in extreme cases, comas and death.  Lead can also cross the fetal barrier during pregnancy, exposing the mother and developing fetus to serious risks, including reduced growth and premature birth.

13.     "No amount of lead is known to be safe."[2]  The "EPA and the Centers for Disease Control and Prevention (CDC) agree that there is no known safe level of lead in a child's blood. Lead is harmful to health, especially for children."[3]

14.     Arsenic is dangerous to humans too.  Long term exposure is linked to cardiovascular disease.  Arsenic can also cause bladder, lung, liver, and skin cancer, and strokes and diabetes. Recent studies have suggested that arsenic may cause IQ deficits in children and may be harmful to fetal development.

15.     There is "essentially no safe level" of arsenic.[4]

---

[2] *See* https://www.npr.org/sections/thetwo-way/2016/08/13/489825051/lead-levels-below-epa-limits-can-still-impact-your-health (last visited July 2, 2019).

[3] *See* https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water (last visited July 2, 2019).

[4] *See* https://publicintegrity.org/environment/what-to-do-if-your-drinking-water-contains-arsenic/ (last visited July 2, 2019).

16.     The People of the State of California declared by initiative under Proposition 65 their right "[t]o be informed about exposures to chemicals that cause cancer, birth defects, or other reproductive harm."  Proposition 65, § 1(b).  To effectuate this goal, California's Proposition 65, Health & Safety Code § 25249.5, et seq., prohibits exposing people to chemicals listed by the State of California as known to cause cancer, birth defects or other reproductive harm above certain levels without a "clear and reasonable warning," unless the business responsible for the exposure can prove that it fits within a statutory exemption.

17.     Lead and lead compounds are subject to the clear and reasonable warning requirement regarding carcinogens under Proposition 65.  Specifically, a Proposition 65 warning is required where a total daily intake of lead exceeds .5 mcg.

18.     Arsenic and arsenic compounds are subject to the clear and reasonable warning requirement regarding carcinogens under Proposition 65.  Specifically, a Proposition 65 warning is required where a total daily intake of lead exceeds 0.5 mcg.

19.     This Complaint does not allege a violation of Proposition 65.  Proposition 65 is relevant, however, to the extent it provides information concerning the material omissions in violation of California's Consumer Protection laws, and guidance as to a reasonable consumer's purchasing decisions.  Reasonable consumers purchased the Products believing, among other things, that they were in compliance with all applicable California regulations and safe according to California regulatory thresholds.  Reasonable consumers would not have purchased the Products if they had known that they contained heightened levels of lead and arsenic, or they would have purchased them on different terms.  Because the presence of lead and arsenic pertain to safety, Defendants had a duty to disclose that its products contained heightened levels of lead and arsenic, independent of any duty imposed by Proposition 65.

20.     The ATSDR identifies cadmium as number seven on its list of substances present in the environment that potentially poses a significant threat to human health. Cadmium, like inorganic arsenic, has been shown to affect a child's IQ level and the development of ADHD.

21.     Several federal and state agencies have regulated cadmium. Pursuant to Proposition 65, California has identified cadmium as causing developmental and male reproductive toxicity and has set an oral Maximum Allowable Dose Level ("MADL") of 4.1 µg (or 4.1 ppb) per day.

22.     The FDA and EPA have set a maximum allowable limit of cadmium of 5 ppb in bottled water and drinking water. The World Health Organization ("WHO") has set a maximum allowable limit of cadmium in drinking water at 3 ppb.

23.     A study examining the effect of cadmium exposure on children concluded that it negatively impacted Full Scale IQ and in particular, boys. According to the 2018 study, boys "exhibiting higher amounts of cadmium exposure had seven fewer IQ points than those exhibiting less cadmium exposure."[5]

24.     Another 2018 study found a link between cadmium exposure and ADHD and concluded that ADHD was more prevalent among children with the high cadmium exposure as compared to the control group.[6]

25.     Mercury is the number three substance on ATSDR's list of substances in the environment potentially posing a significant threat to human health.

26.     As with inorganic arsenic, lead, and cadmium, Healthy Babies Bright Futures advocates for a goal of zero levels of mercury in baby food. Outside the baby food context, the FDA has set a limit of 2 ppb of mercury in bottled water, while the EPA has set a limit of 2 ppb for drinking water.

27.     Mercury's effect on children's development has been studied in the context of a pregnant woman's exposure to mercury. Pre-natal "mercury exposure has been consistently associated with adverse subsequent neuro-development."[7]

---

[5] Klara Gustin, et al., *Cadmium Exposure and Cognitive Abilities and Behavior at 10 Years of Age: A Prospective Cohort Study* (Apr. 2018), available at https://pubmed.ncbi.nlm.nih.gov/29459184/

[6] Min-Jing Lee, et al., Heavy Metals' Effects on Susceptibility to Attention-Deficit/Hyperactivity Disorder: Implication of Lead, Cadmium, and Antimony (June 10, 2018), available at https://pubmed.ncbi.nlm.nih.gov/29890770/

[7] Margaret R. Karagas, et al., *Evidence on the Human Health Effects of Low-Level Methylmercury Exposure* (June 1, 2012), available at https://pubmed.ncbi.nlm.nih.gov/22275730/

## II.   Facts Specific To Defendants' Products

### A.   Hain's "Earth's Best" Baby Food

28.   Hain manufacturers, distributes, and sells food for babies under the brand name Earth's Best.  To gain the trust of the consuming public, Hain touts itself as a family company that cares about the health of babies and kids and the foods they eat.  On its website at www.earthsbest.com, Hain promises to produce "pure, quality products" that parents "can trust."

29.   Hain uniformly markets, advertises, represents, and warrants the Earth's Best Products as safe and suitable for consumption by babies.

30.   On the front of the label of the Earth's Best Products, Hain depicts sitting and/or standing babies.  With regard to the Earth's Best Whole Grain Rice Cereal, Hain represents that it is "Babies Perfect Solid Food" in conspicuous letters on the front of the label and on the back, Hain represents, "All Babies Begin Life 100% Pure . . . Feed Them Accordingly."  Further, Hain also says on the back of the product, "From the first spoonful on, you can be sure your baby's rapidly developing little body is getting only pure, healthy, organic, nutrition."  Hain's labeling and statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the Earth's Best Whole Grain Rice Cereal products are safe and suitable for consumption by babies.

31.   With regard to the Earth's Best Whole Grain Oatmeal Cereal, Hain represents that it is "For Babies Ready to Move Beyond Rice Cereal," in conspicuous letters on the front of the label and on the back, Hain represents, "All Babies Begin Life 100% Pure . . . Feed Them Accordingly."  Hain's labeling and statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the Earth's Best Whole Grain Oatmeal Cereal products are safe and suitable for consumption by babies.

32.   Hain has also offered the Earth's Best Sweet Potatoes Organic Baby Food in a jar in two versions: Sweet Potatoes Organic Baby Food 1, and Sweet Potatoes Organic Baby Food 2. Hain represents that Sweet Potatoes Organic Baby Food 1 is for babies four months or older and has represented that Sweet Potatoes Organic Baby Food 2 is for babies six months or older.  Hain's labeling and statements, taken together and read as a whole from the perspective of a reasonable

consumer, conveyed that the Earth's Best Sweet Potatoes Organic Baby Food products are safe and suitable for babies to consume.

33.     In February 2021, the U.S. House of Representatives issued a Report revealing that certain companies knowingly sold baby food products containing excessive levels of heavy metals, such as inorganic arsenic, lead, cadmium, and mercury.  The report identified Hain as one of those companies.

34.     Indeed, the Report states that Hain sold finished baby food products containing harmful heavy metals, including those listed above, even though the ingredients themselves exceeded internal levels for heavy metals that Hain set.

35.     Specifically, Hain sold finished baby food products containing as much as 129ppb inorganic arsenic, and ingredients testing as high as 309 ppb arsenic.  As to lead, some ingredients that Hain used had as much as 352 ppb lead; in particular, 88 ingredients tested over 20 ppb lead and six tested over 200 ppb lead.  As to cadmium, Hain used ingredients that tested as high as 260 ppb; in particular, 102 ingredients tested had over 20 ppb cadmium.

36.     Hain has also added vitamin/mineral pre-mixes having high levels of toxic heavy metals into its baby foods.  According to the Report, in a meeting with the FDA, Hain tried to justify its failure to adhere to its own internal limits based on what it called "theoretical calculations," even despite conceding to the FDA that its testing "underestimated final product toxic heavy metals."

37.     Further, while Hain admitted that it does not regularly test finished baby foods for inorganic arsenic, when it did test a small sample of finished product, its testing revealed 129 ppb inorganic arsenic.

38.     Additional testing conducted by the Healthy Babies Bright Futures group confirms that Earth's Best Products, including those identified here, had harmful heavy metals.

39.     Despite touting itself as a family company that cares about quality baby food that parents can trust, and conveying through statements on product labeling that the Earth's Best Products are safe and suitable for babies, Hain sold food products that were unsafe for babies and

also failed to warn and disclose material facts, including that its products contained harmful heavy metals, including inorganic arsenic, lead, cadmium, and/or mercury.

**B.    Beech-Nut Baby Food**

40.    Beech-Nut manufacturers, distributes, and sells food for babies under the brand name Beech-Nut.  To gain the trust of the consuming public, Beech-Nut paints itself as a company that, since 1931, has offered real food for babies that is healthier and undergoes rigorous testing for harmful ingredients.  According to its website at www.beechnut.com, Beech-Nut promises that "Making high quality, safe, and nutritious foods for babies and toddlers will always be our #1 priority."

41.    Beech-Nut uniformly markets, advertises, represents, and warrants the Beech-Nut Products as safe and suitable for consumption by babies.

42.    Regarding the Beech-Nut Rice Single Grain Baby Cereal, Beech-Nut represents that the cereal is for babies four months and over.  On the back of the label, Beech-Nut again represents that the food is for babies and that it does not contain harmful ingredients, such as BPA.  Beech-Nut's labeling and statements, taken together and considered as a whole, from the perspective of a reasonable consumer, conveyed that the Beech-Nut Rice Single Grain Baby Cereal products are safe and suitable for consumption by babies.

43.    Beech-Nut also offers baby food in jars that are simply designed to convey that they contain wholesome and pure ingredients. Regarding the Classic Sweet Carrots baby food, on the front of the jar, Beech-Nut says that the product is for babies six months or over and around the lid of the jar, Beech-Nut repeatedly states that nothing artificial is added.

44.    As to the Beech-Nut Naturals Just Sweet Potatoes, on the front of the jar Beech-Nut says the product is for babies who are four months or older and around the lid of the jar, Beech-Nut repeatedly states: "real food for babies."

45.    Regarding the Classic Mixed Vegetables, on the front of the jar, Beech-Nut says it is for babies six months or older and around the lid of the jar, Beech-Nut repeatedly states that the food has "nothing artificial added."

46.     The congressional report released on February 4, 2021 also identified Beech-Nut as a company that knowingly sold baby food products with ingredients testing high in toxic heavy metals.  Beech-Nut indicated that it did not test final products, but instead only ingredients.

47.     According to the Report, internal testing documents show that "Beech-Nut used ingredients after they tested as high as 913.4 ppb arsenic" and "routinely used high-arsenic additives that tested over 300 ppb arsenic to address product characteristics such as "crumb softness."

48.      In particular, internal documents show that the ingredient "Rice Flour," which Beech-Nut uses in the Beech-Nut Rice Single Grain Baby Cereal, repeatedly tested over 100 ppb and sometimes as high as 170 ppb.  Worse, it appears that Beech-Nut set a limit of 100 ppb and instead of rejecting the ingredients that tested above that level, Beech-Nut used them.  Other ingredients that Beech-Nut used in its baby food products, such as Amylase, BAN 800, Alpha Amylase and Sebamyl 100, are enzymes that tested in the range of 353 ppb to 913.40 ppb arsenic.

49.     Although there is no established safe limit for lead in baby food, Beech-Nut used ingredients testing at extremely high lead levels, such as 886.9 ppb.  According to the Report, Beech- Nut used 57 ingredients that contained over 20 ppb lead, which is four times the limit the FDA has set for bottled water.  For example, in testing commissioned by Healthy Babies Bright Futures, the Classics Sweet Carrots contained 27.2 ppb lead, while the Naturals Just Sweet Potatoes contained 14.1 ppb lead and the Classic Mixed Vegetables contained 17.9 ppb lead.

50.     Regarding cadmium, Beech-Nut used ingredients testing at over 100 ppb, which is 20 times more than the limit for bottled water.  Testing commissioned by Healthy Babies Bright Futures shows that the Beech-Nut Products tested for cadmium in harmful levels.

51.     Internal documents identified in the Report show that Beech-Nut did not even test its baby food products for Mercury, while the Health Babies Bright Future showed that they did contain mercury.

52.      All the Beech-Nut Products specified herein, and others, have tested positive for harmful toxic heavy metals.  Despite touting itself as a company that prioritizes making safe and

nutritious baby food, and conveying through statements on product labeling that the Beech-Nut

Products are safe and suitable for babies, Beech-Nut sold food products that were unsafe for babies

and also failed to warn and disclose material facts, including that its products contained harmful

heavy metals, including inorganic arsenic, lead, cadmium, and/or mercury.

**C.     Gerber Baby Food**

53.     Gerber manufacturers, distributes, and sells food for babies and offers of a wide

variety of different food products such as traditional baby food purees, baby cereals, puffs, and rice

cakes.  To gain the trust of the consuming public, Gerber holds itself out as company that cares

about the health of babies and kids and the foods they eat.  According to its website at

www.gerber.com, "100% of our products meet all FDA requirements."  Gerber claims to do

"[o]ver 100 quality checks in every jar" throughout "5 different stages of safety and quality checks

from farm to spoon," and promises that "[t]he health and safety of your little one has been and will

always be our highest priority."

54.     Gerber uniformly markets, advertises, represents, and warrants that its products are

safe and suitable for consumption by babies.

55.     Indeed, every label of a Gerber product features the famous "Gerber Baby" that the

company is known for.  The Gerber Puffs label also clearly depicts a crawling baby and indicates

that the puffs are intended for "Crawler" babies, age 8+ months.  Gerber also markets its Puffs as

supporting "brain development and learning ability."  Gerber's statements, taken together and

considered as a whole, from the perspective of a reasonable consumer, conveyed that the Gerber

Puffs are safe and suitable for consumption by babies.

56.     The Gerber Puffs are sold in several flavors: Strawberry Apple, Banana, Blueberry,

Sweet Potato, Vanilla, Apple Cinnamon, Peach, Organic Cranberry Orange, Organic Fig Berry,

and Organic Apple Puffs.

57.     Gerber also sells "Lil' Crunchies" baby food products.  On the front of the label is

the famous "Gerber Baby," as well as a clear depiction of a crawling baby and indicates that the

Lil' Crunchies are intended for "Crawler" babies, age 8+ months.  The packaging also touts the fact

that the Lil' Crunchies are "Baked with Whole Grains."  Gerber's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the Gerber Lil' Crunchies are safe and suitable for consumption by babies.  Gerber's Lil' Crunchies are sold in several flavors, including: Mild Cheddar, Veggie Dip, Garden Tomato, Apple Sweet Potato, Ranch, Vanilla Maple, Organic White Cheddar Broccoli, and Organic White Bean Hummus.

58.   Gerber's Yogurt Melts products also depict the famous "Gerber Baby," as well as a depiction of a crawling baby and indicates that the Gerber Yogurt Melts are intended for "Crawler" babies, age 8+ months.  The packaging also touts the fact that the Gerber Yogurt Melts are "made with real fruit."  Gerber's statements, taken together and considered as a whole, from the perspective of a reasonable consumer, convey that the Gerber Yogurt Melts are safe and suitable for consumption by babies.  The Gerber Yogurt Melts are sold in several flavors, including: Strawberry, Very Berry Blend, Truly Tropical Blend, Mixed Berries, Banana Vanilla, Peach, Organic Banana Strawberry, and Organic Red Berries.

59.   According to the Report, Gerber sold finished baby food products, despite internal testing showing that the products were unsafe because they contained ingredients with high levels of harmful heavy metals which are unsafe for babies.

60.   For example, regarding inorganic arsenic, Gerber's own testing showed that Gerber was routinely using rice flour that contained over 90 ppb of inorganic arsenic, even though there is no established safe level of arsenic for baby foods.  That is nearly 10 times more than the limit that the FDA has set for bottled water and that the EPA and WHO have set for drinking water.

61.   Regarding lead, Gerber's own limited lead testing showed ingredients, such as sweet potatoes, with as high as 48 ppb of lead, even though there is no amount of lead in a child's blood which is considered safe.  Moreover, that is over 15 times the FDA's Interim Reference Level of 3 ppb of lead for food consumed by children.

62.   As to cadmium, the Congressional Report showed that Gerber used ingredients containing as much as 87 ppb, far exceeding the 5ppb allowed by the FDA and EPA for bottled and drinking water.  Testing also showed that some products contained mercury.

63.     As the testing referenced herein shows, from 2017 to 2019 and possibly later, Gerber sold baby food products that had harmful levels of inorganic arsenic, lead, cadmium and/or mercury.  Third-party testing has also shown that numerous Gerber products, including Gerber Puffs, Gerber Melts, and other Gerber snacks contain excessively high amounts of inorganic arsenic, lead, cadmium and or mercury.

64.     Despite touting itself as a family company that cares about babies and children and aims to provide nutritious and healthy foods, and conveying through statements on product labeling that the Gerber Products are safe and suitable for babies, Gerber also sold food products that were unsafe for babies and also failed to warn and disclose material facts, including that its products contained harmful heavy metals, including inorganic arsenic, lead, cadmium, and/or mercury.

**D.     The High Presence Of Toxic Heavy Metals In Baby Foods Far Exceeds Consumer Expectations**

65.     Parents' instinctive desire to protect and ensure the healthy development of their children is well-known.  As such, the safety of baby food is of paramount importance, and is a material fact, to consumers (such as Plaintiff and Class members).

66.     More specifically, given the negative effects of toxic heavy metals (such as arsenic, lead, cadmium, and mercury) on child development, the presence of those substances in baby food is a material fact to consumers (such as Plaintiff and members of the Class).  Indeed, consumers— such as Plaintiff and members of the Class—are unwilling to purchase baby food that contains elevated levels of toxic heavy metals.

67.     Defendants know that the safety of its brand of baby food (as a general matter) is a material fact to consumers.

68.     Defendants also know that consumers (such as Plaintiff and members of the Class) are unwilling to purchase their respective brands of baby food that contain elevated levels of toxic heavy metals.

69.     As such, Defendants also know that the presence of toxic heavy metals in its brand of baby food is a material fact to consumers (such as Plaintiff and Class members).

70.     Baby food manufacturers (such as Defendants) hold a special position of public trust.  Consumers believe that they would not sell products that are unsafe.

71.     Defendants knew that if the elevated levels of toxic heavy metals in its baby food was disclosed to Plaintiff and Class members, then Plaintiff and Class members would be unwilling to purchase it.

72.      In light of Defendants' respective knowledge that Plaintiff and Class members would be unwilling to purchase its baby food Products if they knew that those brands of baby food contained elevated levels of toxic heavy metals,  Defendants intentionally and knowingly concealed this fact from Plaintiff and Class members, and did not disclose the presence of those toxic heavy metals on the labels of the Products.

73.     Defendants knew that Plaintiff and Class members would rely upon the representations and omissions contained on the packages of the Products, and intended for them to do so.

74.     Defendants knew that in relying upon the representations and omissions contained on the packages of the Product (respectively), Plaintiff and Class members would view those products as being safe for consumption, given their represented lack of certain deleterious substances (*e.g.*, BPA, GMOs), and Defendants' concealment of the fact that those brands of baby food contained elevated levels of toxic heavy metals.

75.     Prior to purchasing the Products Plaintiff and Class members were exposed to, saw, read, and understood Defendants' representations and omissions regarding the safety of their baby food, and relied upon them.

76.     As a result of Defendants' respective representations regarding the safety of their baby food, and Defendants' concealment of the fact that its baby food contained elevated levels of toxic heavy metals, Plaintiff and Class members reasonably believed that Defendants' Products were free from substances that would negatively affect children's development.

77.     In reliance upon Defendants' respective representations and omissions, Plaintiff and Class members purchased Defendants' baby food Products.

78.     Had Plaintiff and Class members known the truth—*i.e.*, that Defendants' respective brands of baby food contained elevated levels of toxic heavy metals, rendering them unsafe for consumption by children—they would not have been willing to purchase them at all.

79.     Therefore, as a direct and proximate result of Defendants' misrepresentations and omissions concerning their respective brands of baby food, Plaintiff and Class members purchased the Products.

80.     Plaintiff and Class members were harmed in the form of the monies they paid for the Products which they would not otherwise have paid had they known the truth.  Since the presence of elevated levels of toxic heavy metals in baby food renders it unsafe for human consumption, the Products that Plaintiff and Class members purchased are worthless.

### III.   The High Presence of Toxic Heavy Metals In Baby Foods Far Exceeds Consumer Expectations

81.     Parents' instinctive desire to protect and ensure the healthy development of their children is well-known.  As such, the safety of baby food is of paramount importance, and is a material fact, to consumers (such as Plaintiff and Class members).

82.     More specifically, given the negative effects of toxic heavy metals (such as arsenic, lead, cadmium, and mercury) on child development, the presence of those substances in baby food is a material fact to consumers (such as Plaintiff and members of the Class).  Indeed, consumers—such as Plaintiff and members of the Class—are unwilling to purchase baby food that contains elevated levels of toxic heavy metals.

83.     Defendants know that the safety of its brand of baby food (as a general matter) is a material fact to consumers.

84.     Defendants also know that consumers (such as Plaintiff and members of the Class) are unwilling to purchase their respective brands of baby food that contain elevated levels of toxic heavy metals.

85.     As such, Defendants also know that the presence of toxic heavy metals in its brand of baby food is a material fact to consumers (such as Plaintiff and Class members).

86.     Baby food manufacturers (such as Defendants) hold a special position of public trust.  Consumers believe that they would not sell products that are unsafe.

87.     Defendants knew that if the elevated levels of toxic heavy metals in its baby food was disclosed to Plaintiff and Class members, then Plaintiff and Class members would be unwilling to purchase it.

88.      In light of Defendants' respective knowledge that Plaintiff and Class members would be unwilling to purchase its baby food Products if they knew that those brands of baby food contained elevated levels of toxic heavy metals,  Defendants intentionally and knowingly concealed this fact from Plaintiff and Class members, and did not disclose the presence of those toxic heavy metals on the labels of the Products.

89.     Defendants knew that Plaintiff and Class members would rely upon the representations and omissions contained on the packages of the Products, and intended for them to do so.

90.     Defendants knew that in relying upon the representations and omissions contained on the packages of the Products (respectively), Plaintiff and Class members would view those products as being safe for consumption, given their represented lack of certain deleterious substances (*e.g.*, BPA, GMOs), and Defendants' concealment of the fact that those brands of baby food contained elevated levels of toxic heavy metals.

91.     Prior to purchasing the Product Plaintiff and Class members were exposed to, saw, read, and understood Defendants' representations and omissions regarding the safety of their baby food, and relied upon them.

92.     As a result of Defendants' respective representations regarding the safety of their baby food, and Defendants' concealment of the fact that its baby food contained elevated levels of toxic heavy metals, Plaintiff and Class members reasonably believed that Defendants' Products were free from substances that would negatively affect children's development.

93.     In reliance upon Defendants' respective representations and omissions, Plaintiff and Class members purchased Defendants' baby food Products.

94.     Had Plaintiff and Class members known the truth—*i.e.*, that Defendants' respective brands of baby food contained elevated levels of toxic heavy metals, rendering them unsafe for consumption by children—they would not have been willing to purchase them at all.

95.     Therefore, as a direct and proximate result of Defendants' misrepresentations and omissions concerning their respective brands of baby food, Plaintiff and Class members purchased the Products.

96.     Plaintiff and Class members were harmed in the form of the monies they paid for the Products which they would not otherwise have paid had they known the truth.  Since the presence of elevated levels of toxic heavy metals in baby food renders it unsafe for human consumption, the Products that Plaintiff and Class members purchased are worthless.

**CLASS ACTION ALLEGATIONS**

97.     Plaintiff seeks to represent a class defined as all persons in the United States who purchased the Products (the "Class").  Excluded from the Class are persons who made such purchases for purpose of resale.  Plaintiff reserves the right amend the above class definition as appropriate after further investigation and discovery, including by seeking to certify a narrower multi-state class (or classes) in lieu of a nationwide class if appropriate.

98.     Plaintiff also seeks to represent a Subclass of all Class Members who purchased the Products in California (the "California Subclass").

99.     At this time, Plaintiff does not know the exact number of members of the Class; however, given the nature of the claims and the number of retail stores in the United States selling the Products, Plaintiff believes that class members are so numerous that joinder of all members is impracticable.

100.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the class and subclass that predominate over questions that may affect individual class members include:

  a.   whether the Products contain toxic heavy metals;

b.  whether Defendants' conduct is unethical, oppressive, unscrupulous, and/or substantially injurious to consumers;

c.  whether the amount of toxic heavy metals in the Products is material to a reasonable consumer;

d.  whether Defendants had a duty to disclose that its Products had heightened levels of toxic heavy metals;

e.  whether Plaintiff and members of the Class are entitled to injunctive and other equitable relief;

f.  whether Defendants failed to disclose material facts concerning the Products;

g.  whether Defendants' conduct was unfair and/or deceptive;

h.  whether Defendants have been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon Defendants by Plaintiff and class members;

i.  whether Defendants breached implied warranties to Plaintiff and class members;

j.  whether Plaintiff and class members have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

101.    Plaintiff's claims are typical of those of the class members because Plaintiff, like other class members, purchased, in a typical consumer setting, a Product and Plaintiff sustained damages from Defendants' wrongful conduct.

102.    Plaintiff will fairly and adequately protect the interests of the class members and have retained counsel that is experienced in litigating complex class actions.  Plaintiff has no interests which conflict with those of the Class or the Subclass.

103.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

104.    The prerequisites to maintaining a class action for equitable relief are met as Defendants has acted or refused to act on grounds generally applicable to the Class and the

Subclass, thereby making appropriate equitable relief with respect to the Class and the Subclass as a whole.

105.    The prosecution of separate actions by members of the Class and the Subclass would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants.  For example, one court might enjoin Defendants from performing the challenged acts, whereas another might not.  Additionally, individual actions could be dispositive of the interests of the Class and the Subclass even where certain Class members are not parties to such actions.

## CAUSES OF ACTION

### FIRST COUNT
**(Violation of California Business & Professions Code § 17200 *et seq.*,**
**Based on Fraudulent Acts and Practices)**

106.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

107.    Plaintiff brings this claim individually and on behalf of the Subclass members against all Defendants.

108.    Under California Business & Professions Code §17200, any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice.

109.    Defendants have engaged, and continues to engage, in conduct that is likely to deceive members of the public.  This conduct includes, but is not limited to, failing to disclose that the Products contain heightened levels of toxic heavy metals.

110.    After reviewing the packaging for the Products, Plaintiff purchased the Products in reliance on Defendants' omissions.  Plaintiff would not have purchased the Products at all if she had known of Defendants' material omission that the Products contain heightened levels of toxic heavy metals.  Plaintiff and class members have all paid money for the Products.  However, Plaintiff and class members did not obtain the full value or any value of the advertised products due to Defendants' omissions regarding the heightened levels of toxic heavy metals.  Accordingly,

Plaintiff and class members have suffered injury in fact and lost money or property as a direct result of Defendants' material omissions.

111.   By committing the acts alleged above, Defendants have engaged in fraudulent business acts and practices, which constitute unfair competition within the meaning of California Business & Professions Code §17200.

112.   In accordance with California Business & Professions Code §17203, Plaintiff seek an order: (1) enjoining Defendants from continuing to conduct business through its fraudulent conduct; and (2) requiring Defendants to conduct a corrective advertising campaign.

113.   As a result of Defendants' conduct, Plaintiff seeks restitution, disgorgement, and injunctive under California Business & Professions Code §17203.

**SECOND COUNT**
**(Violations of California Business & Professions Code §17200, *et seq.*,**
**Based on Commission of Unlawful Acts)**

114.   Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

115.   Plaintiff brings this claim individually and on behalf of the Subclass members against all Defendants.

116.   The violation of any law constitutes an unlawful business practice under California Business & Professions Code §17200.

117.   Defendants have violated §17200's prohibition against engaging in unlawful acts and practices by, inter alia, making omissions of material facts, as set forth more fully herein, and violating California Civil Code §§1572, 1573, 1709, 1710, 1711, 1770, California Business & Professions Code §17200 et seq., California Health & Safety Code §110660, 21 U.S.C. §321, and by violating the common law.

118.   By violating those laws, Defendants have engaged in unlawful business acts and practices, which constitute unfair competition within the meaning of Business & Professions Code §17200.

119.    Plaintiff purchased the Products in reliance on Defendants' representations that the Products were fit for consumption and based on the omissions as to the amount of toxic heavy metals contained therein.  Plaintiff would not have purchased the Products at all had she known Defendants' omissions.  Plaintiff and class members paid money for the Products.  However, Plaintiff and class members did not obtain the full value, or any value, of the advertised products due to Defendants' omissions regarding the Products.  Accordingly, Plaintiff and class members have suffered injury in fact and lost money or property as a direct result of Defendants' material omissions.

120.    In accordance with California Business & Professions Code §17203, Plaintiff seeks an order: (1) enjoining Defendants from continuing to conduct business through its fraudulent conduct; and (2) requiring Defendants to conduct a corrective advertising campaign.

121.    As a result of Defendants' conduct, Plaintiff seeks restitution, disgorgement, and injunctive relief under California Business & Professions Code §17203.

### THIRD COUNT
**(Violations of California Business & Professions Code §17200, *et seq.*,
Based on Unfair Acts and Practices)**

122.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

123.    Plaintiff brings this claim individually and on behalf of Subclass members against all Defendants.

124.    Under Business & Professions Code §17200, any business act or practice that is unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, or that violates a legislatively declared policy, constitutes an unfair business act or practice.

125.    Defendants have engaged, and continue to engage, in conduct which is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.  This conduct includes failing to disclose that the Products contain heightened levels of toxic heavy metals.

126. Defendants have engaged, and continue to engage, in conduct that violates the legislatively declared policies of: (1) California Civil Code §§1572, 1573, 1709, 1710, 1711 against committing fraud and deceit; (2) California Civil Code §1770 against committing acts and practices intended to deceive consumers regarding the representation of goods in certain particulars; (3) California Health & Safety Code §110660 and 21 U.S.C. §321 against misbranding food. Defendants gained an unfair advantage over its competitors, whose labeling, advertising, and marketing for other similar products must comply with those laws.

127. Defendants' conduct is substantially injurious to consumers. Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have purchased the Products at all but for Defendants' omissions regarding the levels of toxic heavy metals contained in the Products. Such injury is not outweighed by any countervailing benefits to consumers or competition. Indeed, no benefit to consumers or competition results from Defendants' conduct. Since consumers reasonably rely on Defendants' representations, and thus also their omissions, and injury results from ordinary use of the Products, consumers could not have reasonably avoided such injury. *Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581, 597-98 (2009); *see also Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) (outlining the third test based on the definition of "unfair" in Section 5 of the FTC Act).

128. By committing the acts alleged above, Defendants have engaged in unfair business acts and practices which constitute unfair competition within the meaning of Business & Professions Code §17200.

129. Plaintiff purchased the Products believing them to be fit for consumption due to its omissions regarding the heightened levels of toxic heavy metals in the Products. Plaintiff would not have purchased the Products at all but for Defendants failing to disclose that they contained toxic heavy metals in high quantities. Plaintiff and class members paid money for the Products. However, Plaintiff and class members did not obtain the full value of the advertised products due to Defendants' omissions regarding the nature of said Products. Accordingly, Plaintiff and class

members suffered an injury in fact and lost money or property as a direct result of Defendants'

material omissions.

130.    In accordance with California Business & Professions Code §17203, Plaintiff seeks

an order enjoining Defendants from continuing to conduct business through its fraudulent conduct

and further seeks an order requiring Defendants to conduct a corrective advertising campaign.

131.    As a result of Defendants' conduct, Plaintiff seeks restitution, disgorgement, and

injunctive relief under California Business & Professions Code §17203.

**FOURTH COUNT**
**(Violations of the California Consumer Legal Remedies Act)**
**(Injunctive Relief Only)**

132.    Plaintiff incorporates by reference the foregoing paragraphs of Complaint as if fully

stated herein.

133.    Plaintiff brings this claim individually and on behalf of Subclass members against

all Defendants.

134.    Plaintiff purchased Defendants' Products for household use.

135.    The acts and practices of Defendants as described above were intended to deceive

Plaintiff and class members as described herein, and have resulted, and will result, in damages to

Plaintiff and member of the Subclass.  Those actions violated, and continue to violate, the

California Consumers Legal Remedies Act ("CLRA") in at least the following respects:

    a.   In violation of California Civil Code §1770(a)(5) of the CLRA, Defendants' acts

and practices constitute representations or omissions deceiving that the Products

have characteristics, uses, and/or benefits, which they do not;

    b.   in violation of California Civil Code §1770(a)(7) of the CLRA, Defendants' acts

and practices constitute representations that the Products are of a particular quality,

which they are not; and

c.   in violation of California Civil Code §1770(a)(9) of the CLRA, Defendants' acts and practices constitute the advertisement of the goods in question without the intent to sell them as advertised.

136.   By committing the acts alleged above, Defendants have violated the CLRA.

137.   Plaintiff and Subclass members suffered injuries caused by Defendants' misrepresentations and/or omissions because they were induced to purchase the Products they would not have otherwise purchased if they had known that they contained heightened levels of toxic heavy metals.

138.   In compliance with the provisions of California Civil Code §1782, Plaintiff sent written notice to Defendants on February 24, 2021 and March 12, 2021, informing them of her intention to seek damages under California Civil Code §1750, et seq.  The letter expressly stated that it was sent on behalf of Plaintiff and "all other persons similarly situated."  Accordingly, Plaintiff will seek damages from Defendants for their violations of the CLRA if they do not remedy the alleged violations of the CLRA set forth above within the time prescribed by the statute.

139.   Plaintiff and class members are entitled to, pursuant to California Civil Code §1780, an order enjoining the above-described wrongful acts and practices of Defendants, and any other relief deemed appropriate and proper by the Court under California Civil Code §1780.

**FIFTH COUNT**
**(Breach of Implied Warranty Under the Song-Bervely Act, Cal. Civ. Code § 1790 *et seq*. and California Commercial Code § 2314)**

140.   Plaintiff incorporates by reference the foregoing paragraphs of Complaint as if fully stated herein.

141.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against all Defendants.

142.   Under the Song-Bervely Consumer Warranty Act, Cal. Civ. Code § 1790, et seq., and California Commercial Code § 2314, every sale of consumer goods in this State is accompanied by both a manufacturer's and retail seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in this State is

accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

143.   The Products at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

144.   Plaintiff and the Class members who purchased one or more of the Products are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

145.   Defendants are in the business of manufacturing, assembling, producing and/or selling the Products to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

146.   Defendants impliedly warranted to retail buyers that the Products were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used. For a consumer good to be "merchantable" under the Act, it must satisfy both of those elements. Defendants breached the implied warranties because the Products were unsafe and defective. Therefore, the Products would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

147.   Plaintiff and Class members purchased the Products in reliance upon Defendants' skill and judgment in properly packaging and labeling the Products.

148.   The Products were not altered by Plaintiff or Class members.

149.   The Products were defective at the time of sale when they left the exclusive control of Defendants.  The defect described in this complaint was latent in the product and not discoverable at the time of sale.

150.   Defendants knew that the Products would be purchased and used without additional testing by Plaintiff and Class members.

151.   As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class members have been injured and harmed because they would not have purchased the Products if they knew the truth about the products, namely, that they contained high levels of toxic heavy metals.

**SIXTH COUNT**
**(Unjust Enrichment)**

152.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

153.   Plaintiff brings this claim individually and on behalf of the members of the Class and Subclass against all Defendants.

154.   Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff and Class Members' purchases of the Products.  Retention of those monies under the circumstances is unjust and inequitable because Defendants failed to disclose that the Products were unfit for use as baby food.  Defendants' misrepresentations and/or material omissions caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts were known.

155.   Retention of those monies also is unjust and inequitable.

156.   Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and Class Members for its unjust enrichment, as ordered by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff and all members of the proposed classes the following relief against Defendants:

a.   That the Court certify the Class and Subclass under Rule 23 of the Federal Rules of Civil Procedure and appoint Plaintiff as Class Representative and her attorneys as Class Counsel to represent the members of the Class and Subclass;

b.   That the Court declare that Defendants' conduct violates the statutes referenced herein;

c.  That the Court preliminarily and permanently enjoin Defendants from conducting business through the unlawful, unfair, or fraudulent business acts or practices, untrue, and misleading labeling and marketing and other violations of law described in this Complaint;

d.  That the Court order preliminary and injunctive relief requiring Defendants to disclose that its products contain heightened levels of toxic heavy metals;

e.  That the Court order Defendants to implement whatever measures are necessary to remedy the unlawful, unfair, or fraudulent business acts or practices, untrue and misleading advertising, and other violations of law described in this Complaint;

f.  That the Court order Defendants to notify each and every individual and/or business who purchased the Products of the pendency of the claims in this action to give such individuals and businesses an opportunity to obtain restitution from Defendants;

g.  That the Court grant Plaintiff's reasonable attorneys' fees and costs of suit pursuant to California Code of Civil Procedure §1021.5, California Civil Code §1780(d), the common fund doctrine, and/or any other appropriate legal theory; and

h.  That the Court grant such other and further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: March 18, 2021                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   */s/ Joel D. Smith*
          Joel D. Smith

L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455

Email:  ltfisher@bursor.com
jsmith@bursor.com
breed@bursor.com

*Attorneys for Plaintiff Shelby Baker*

1

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

2    I, Joel Smith, declare as follows:

3          1.       I am an attorney at law licensed to practice in the State of California and a member

4    of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff

5    Shelby Baker in this action.  Shelby Baker is a resident of Bakersfield, California.  I have personal

6    knowledge of the facts set forth in this declaration and, if called as a witness, I could and would

7    competently testify thereto under oath.

8          2.       The Complaint filed in this action is filed in the proper place for trial under Civil

9    Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred

10   in the Central District of California.

11         I declare under the penalty of perjury under the laws of the State of California and the

12   United States that the foregoing is true and correct and that this declaration was executed at Walnut

13   Creek, California this 18th day of March 2021.

14

15                                    */s/ Joel D. Smith*
                                        Joel D. Smith

16

17

18

19

20

21

22

23

24

25

26

27

28

CLRA VENUE DECLARATION