ECF,RELATED

# U.S. District Court
## Southern District of New York (Foley Square)
### CIVIL DOCKET FOR CASE #: 1:21-cv-02129-MKV

Strobel v. Nurture, Inc.
Assigned to: Judge Mary Kay Vyskocil
Demand: $5,000,000
Related Case: 1:21-cv-01217-MKV
Cause: 28:1332 Diversity Action

Date Filed: 03/11/2021
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**

**Jessica Strobel**
*individually and on behalf of all others
similarly situated*

represented by **Hassan A. Zavareei**
Tycko & Zavareei LLP
1828 L Street N.W. Suite 1000
Washington, DC 20036
(202) 973-0900
Fax: 202-973-0950
Email: hzavareei@tzlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan K. Tycko**
Tycko & Zavareei LLP
1828 L Street, N.W., Suite 1000
Washington, DC 20036
(202)-973-0900
Fax: (202)-973-0950
Email: jtycko@tzlegal.com
*ATTORNEY TO BE NOTICED*

V.

**Movant**

**Nicole Stewart**

represented by **Nicole Stewart**
PRO SE

**Movant**

**Shannon Fitzgerald**

represented by **Shannon Fitzgerald**
PRO SE

**Movant**

**Summer Apicella**

represented by **Summer Apicella**
PRO SE

V.

**Defendant**

**Nurture, Inc.**

represented by **Negin Hadaghian**

*doing business as*
Happy Family Brands

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020-1104
212-335-4500
Fax: 212-335-4501
Email: negin.hadaghian@us.dlapiper.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/11/2021 | 1 | COMPLAINT against Nurture, Inc.. (Filing Fee $ 402.00, Receipt Number ANYSDC-24238315)Document filed by Jessica Strobel..(Tycko, Jonathan) (Entered: 03/11/2021) |
| 03/11/2021 | 2 | CIVIL COVER SHEET filed..(Tycko, Jonathan) (Entered: 03/11/2021) |
| 03/11/2021 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to Nurture, Inc., re: 1 Complaint. Document filed by Jessica Strobel..(Tycko, Jonathan) (Entered: 03/11/2021) |
| 03/11/2021 | 4 | RELATED CASE AFFIRMATION of Jonathan K. Tycko re: that this action be filed as related to 21-cv-1217 (MKV). Document filed by Jessica Strobel..(Tycko, Jonathan) (Entered: 03/11/2021) |
| 03/12/2021 | | ***NOTICE TO ATTORNEY REGARDING CIVIL CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Jonathan K. Tycko. The following case opening statistical information was erroneously selected/entered: County code Albany;. The following correction(s) have been made to your case entry: the County code has been modified to XX Out of State;. (jgo) (Entered: 03/12/2021) |
| 03/12/2021 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Unassigned. .(jgo) (Entered: 03/12/2021) |
| 03/12/2021 | | Case Designated ECF. (jgo) (Entered: 03/12/2021) |
| 03/12/2021 | | CASE REFERRED TO Judge Mary Kay Vyskocil as possibly related to 21-cv-1217. (jgo) (Entered: 03/12/2021) |
| 03/12/2021 | 5 | ELECTRONIC SUMMONS ISSUED as to Nurture, Inc...(jgo) (Entered: 03/12/2021) |
| 03/14/2021 | | CASE ACCEPTED AS RELATED. Create association to 1:21-cv-01217-MKV. Notice of Assignment to follow. (laq) (Entered: 03/14/2021) |
| 03/14/2021 | | NOTICE OF CASE REASSIGNMENT to Judge Mary Kay Vyskocil. Judge Unassigned is no longer assigned to the case. (laq) (Entered: 03/14/2021) |
| 03/14/2021 | | Magistrate Judge Debra C. Freeman is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (laq) (Entered: 03/14/2021) |
| 03/19/2021 | 6 | AFFIDAVIT OF SERVICE of Summons and Complaint. Nurture, Inc. served on 3/17/2021, answer due 4/7/2021. Service was accepted by Aisha Sutton, Agent. Document filed by Jessica Strobel..(Tycko, Jonathan) (Entered: 03/19/2021) |
| 03/29/2021 | 7 | NOTICE of Notice of Filings papers in further support of their motion to consolidate several actions in this District, including the above-captioned Westin action, on the Stewart docket. Document filed by Nicole Stewart, Shannon Fitzgerald, Summer Apicella.. (Feldman, Lori) (Entered: 03/29/2021) |

| 03/31/2021 | 8 | NOTICE OF APPEARANCE by Negin Hadaghian on behalf of Nurture, Inc...(Hadaghian, Negin) (Entered: 03/31/2021) |
| --- | --- | --- |
| 03/31/2021 | 9 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Danone S.A. for Nurture, Inc.. Document filed by Nurture, Inc...(Hadaghian, Negin) (Entered: 03/31/2021) |
| 03/31/2021 | 10 | LETTER MOTION for Extension of Time to File Answer re: 1 Complaint addressed to Judge Mary Kay Vyskocil from Negin Hadaghian dated March 31, 2021. Document filed by Nurture, Inc...(Hadaghian, Negin) (Entered: 03/31/2021) |
| 04/01/2021 | 11 | ORDER granting 10 Letter Motion for Extension of Time to Answer. GRANTED. The deadline for Defendant to answer or otherwise respond to the Complaint s extended from April 6, 2021, to June 7, 2021. Nurture, Inc. answer due 6/7/2021. (Signed by Judge Mary Kay Vyskocil on 4/1/2021) (mro) (Entered: 04/01/2021) |
| 04/05/2021 | 12 | MOTION for Hassan Zavareei to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-24354266. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Jessica Strobel. (Attachments: # 1 Affidavit Affidavit of Hassan Zavareei in Support of Motion for Pro Hac Vice Admission, # 2 California Certificate of Good Standing, # 3 District of Columbia Certificate of Good Standing, # 4 Maryland Certificate of Good Standing, # 5 Text of Proposed Order Proposed Order). (Zavareei, Hassan) (Entered: 04/05/2021) |
| 04/06/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 12 MOTION for Hassan Zavareei to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-24354266. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 04/06/2021) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 04/07/2021 15:13:44 | | |
| **PACER Login:** | tzlegal1 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-02129-MKV |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JESSICA STROBEL, individually and on behalf of all others similarly situated<br><br>     Plaintiff,<br><br>v.<br><br>NURTURE, INC.,<br>*d/b/a/ Happy Family Brands,*<br><br>     Defendant. | CASE NO: **1:21-cv-02129**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jessica Strobel ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendant Nurture, Inc. ("Nurture" or "Defendant") and alleges the following based upon personal knowledge, as well as the investigation of her counsel.

## INTRODUCTION

1.     Nurture advertises and sells baby food products under the name Happy Family Brands (branded "HappyBABY Organics") throughout the United States, including in this District. Nurture has warranted that its baby foods are "organic", "non-GMO", and safe[1] when, in fact, its foods contained harmful levels of heavy metals, including arsenic, lead, mercury, and cadmium. As a recent congressional report from the Subcommittee on Economic and Consumer Policy found, Nurture's baby foods may contain significant levels of toxic heavy metals, which can endanger infant neurological development.

2.     Not knowing that Defendant's baby food—billed as "organic" and "non-GMO"—contained these harmful ingredients, Plaintiff bought Nurture's HappyBABY Organics baby foods to

---

[1] *Quality & Safety of Our Products*, https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/ (last accessed Mar. 10, 2021) ("We can say with the utmost confidence that all Happy Family Organics products are safe for babies and toddlers to enjoy and we are proud to have the best-in-class testing protocols in our industry.").

1

feed to her young daughter. If Plaintiff had known that Nurture's baby foods contained these dangerous ingredients, she would not have purchased HappyBABY Organics baby foods for her child. Because Defendant misrepresented the true nature of the ingredients in its baby foods when it failed to disclose the presence or risk of dangerous levels of heavy metals, Plaintiff brings this action, individually and on behalf of all others similarly situated, against Nurture for breach of express and implied warranties, fraudulent misrepresentation, fraudulent concealment, negligent misrepresentation, unjust enrichment, and violation of consumer protection law.

3.     To stop the sale of Happy Baby Organics baby foods containing dangerous heavy metals to unwitting parents buying food for their babies, Plaintiff seeks an injunction requiring that Defendant stop the sale of its products with these metals and instead test its products so that it can both (1) confirm that ingredients are at safe levels, and (2) disclose those levels to Plaintiff and the consuming public. Plaintiff all seeks monetary relief that restores monies paid for the products to the proposed Class and Sub-Class.

## JURISDICTION

4.     This Court has jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because at least one member of the Class is of diverse state citizenship from Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds the value of $5,000,000, exclusive of interest and costs.

5.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District, Defendant conducts substantial business in this District and the State of New York through its headquarters, sale of products, and website, and Plaintiff has suffered injury as a result of Defendant's acts in this District.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant has its principal place of business in this District in this District and because a substantial part of the events, misrepresentations, and omissions giving rise to this action occurred in, were directed to, and originated in this District.

## PARTIES

7.      Plaintiff Jessica Strobel, a resident of Deltona, Florida, purchased Defendant's baby foods to feed to her two-year-old daughter. Ms. Strobel purchased HappyBABY Organics Clearly Crafted Apples, Sweet Potatoes & Granola Pouch and HappyBABY Organics Clearly Crafted Oatmeal Cereal. She purchased these products between 2018 and 2020 from Publix, Winn Dixie, and Walmart stores in Deltona, Florida.

8.      Plaintiff saw Defendant's nutritional and quality claims on the packaging, including the "organic" representation contained in the very name of the food as well as the stage representations, which she relied on in deciding to purchase two of the Tainted Baby Foods.[2] During that time, based on Defendant's omissions and false and misleading claims, warranties, representations, advertisements, and other marketing, Plaintiff was unaware that the Tainted Baby Foods contained any level of heavy metals or toxins, and she would not have purchased the food if she had known the truth about the hazardous levels of heavy metals or toxins present in the "organic" and "non-GMO" baby foods that Defendant sold at a premium price.

9.      As a result of Defendant's negligent, reckless, and/or knowingly deceptive conduct as alleged herein, Plaintiff was injured when she paid for the Tainted Baby Foods that were not as represented. Plaintiff was injured in the amount of the purchase price of the products because the Tainted Baby Foods containing dangerous ingredients were not the organic, healthy, and safe foods she and so many other parents thought they were buying. Restitution of the purchase price is appropriate because even if the Tainted Baby Foods with dangerous ingredients had some value, the products with dangerous ingredients are different than the safe products Plaintiff believed she was buying.

---

[2] The affected baby foods ("Tainted Baby Foods") include but are not limited to: (1) HappyBABY Organics Clearly Crafted Apples, Sweet Potatoes & Granola Pouch; (2) HappyBABY Organics Clearly Crafted Oatmeal Cereal; (3) HappyBABY Organics Clearly Crafted Oats & Quinoa Cereal; (4) HappyBABY Organics Clearly Crafted Sweet Potatoes; (5) HappyBABY Organics Clearly Crafted Prunes Pouch; (6) HappyBABY Organics Apple, Spinach & Kale Pouch; (7) HappyBABY Organics Apple & Broccoli Puffs; (8) HappyBABY Organics Sweet Potato & Carrot Puffs; (9) HappyBABY Organics Apple Rice Cakes; and (10) HappyBABY Organics Blueberry & Purple Carrot Teethers.

3

10.     Plaintiff was further injured because the Tainted Baby Foods that she purchased have no or *de minimis* value—or a value that was at least less than what she paid for the Tainted Baby Foods—based on the presence of the alleged heavy metals and/or toxins. Plaintiff was also injured because she paid a premium price for the "organic" and "non-GMO" products that contained high quality ingredients that she reasonably assumed were safe for babies and children to ingest. Plaintiff would not have paid this money had she known that the Tainted Baby Foods contained dangerous levels of heavy metals and/or toxins. Damages can be calculated through expert testimony at trial. Further, should Plaintiff encounter HappyBABY Organics baby foods in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Tainted Baby Foods.

11.     Nurture is a Delaware corporation with its headquarters and principal place of business in White Plains, New York.

12.     Defendant formulated, developed, manufactured, labeled, distributed, marketed, advertised, and sold the Tainted Baby Foods under the brand name HappyBABY Organics throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for the Tainted Baby Foods, relied upon by Plaintiff, were prepared, reviewed, and/or approved by Defendant and its agents, and were disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The marketing, advertising, packaging, and labeling for the Tainted Baby Foods were designed to encourage customers to purchase the Tainted Baby Foods, and they reasonably misled reasonable consumers, including Plaintiff and the Class, into purchasing the Tainted Baby Foods. Defendant owns, manufactures, and distributes the Tainted Baby Foods, and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the Tainted Baby Foods. Defendant is responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished baby food products.

## **FACTUAL ALLEGATIONS COMMON TO ALL CLASS MEMBERS**

**I.     Defendant's False and Misleading Marketing of Its Baby Food**

13.     None of the Tainted Baby Foods' packaging disclosed that they contained harmful levels of heavy metals and other ingredients. In other words, nowhere in the labeling, advertising, statements, warranties, or packaging does Defendant disclose that the Tainted Baby Foods contain or have a high risk of containing dangerous levels of heavy metals or other ingredients that do not conform to the labels, packaging, advertising, and statements.

14.     Instead, as shown in the examples below, Defendant's packaging and labels emphasize that HappyBABY Organics baby food is organic, nutritious, and non-GMO. By making these assurances that the Tainted Baby Foods are organic and safe for infant consumption, Defendant warrants, promises, represents, misleads, labels, and advertises that the Tainted Baby Foods are free of any heavy metals or dangerous ingredients.

15.     As seen below, Defendant also warrants that its HappyBABY Organics baby foods are safe for babies and infants by making representation about which stages of infant development the foods are appropriate for. Specifically, Defendant warrants that (1) "Stage 1" baby foods are appropriate for consumption by infants at six months and older; and (2) "Stage 2" baby foods are appropriate for consumption by infants that are comfortable with the consistency of Stage 1 foods. Further, Defendant warrants that its baby foods with labels for "crawling baby," "sitting baby," and "walking baby," are appropriate for consumption by babies who are at those stages of development.

A. Nurture's Stage Representations[3]

## Stages

Stage 2 foods are thicker in consistency and can be started once your baby is comfortable with the consistency of stage 1 foods.  Foods included in this stage are often combination foods like sweet potatoes and banana or apples, squash and turkey.

When looking at the array of baby food choices, you may have noticed that each selection is labeled with a stage. The stages refer to where your baby is developmentally in relation to eating. Stage 1 foods are considered first foods to start around 6 months of age. They are usually single ingredient items including single grain cereals like oatmeal and rice cereal and thinner purees like green beans, squash, apples, peas, bananas, pears and even single pureed proteins like chicken and turkey.

Stage 3 products are chunkier and contain small soft, pieces of foods. Once your baby is doing well and seems comfortable with one stage, use that as a sign that he is likely ready to be progressed to the next stage.

---

[3] *Choosing Store Bought Baby Food*, NURTURE, https://www.happyfamilyorganics.com/learning-center/baby/choosing-store-bought-baby-food/#:~:text=Stage%202%20foods%20are%20thicker,or%20apples%2C%20squash%20and%20turkey. (last visited Mar. 10, 2021).

B.   HappyBABY Organics Clearly Crafted Baby Food – Stage 1

 

C.   HappyBABY Organics Clearly Crafted – Stage 2



D. HappyBABY Organics Superfood Puffs – Crawling Baby




E. HappyBABY Organics Teethers– Sitting Baby




F.   HappyBABY Organics Rice Cakes – Walking Baby



16.     But contrary to Defendant's glaring omissions and misleading claims, the Tainted Baby Foods have been shown to contain worrying levels of arsenic, cadmium, lead, and/or mercury[4]—all known to pose health risks to humans and particularly infants.

---

[4] Healthy Babies Bright Futures, *What's In My Baby's Food?* (Oct. 2019),
https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-
10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf (hereinafter, "Healthy Babies Bright Futures Report").

## II.      HappyBABY Organics Baby Foods Contain Harmful Heavy Metals

17.      Testing[5] has made clear that HappyBABY Organics baby foods may contain heavy metals.

### A.  Healthy Babies Bright Futures Finds Heavy Metals in HappyBABY Organics Baby Foods

18.      In April 2019, Healthy Babies Bright Futures, an alliance of nonprofit organizations, commissioned a national laboratory to test 168 containers of baby food for total recoverable arsenic, lead, cadmium, and mercury, as well as speciated arsenic for a subset of samples.

19.      Fourteen HappyBABY Organics baby food products were tested in this study.[6]

20.      Healthy Babies Bright Futures found that the samples contained heavy metals, including arsenic, lead, mercury, and cadmium.

21.      The researchers who published the Healthy Babies Bright Futures Report on healthybabyfood.org explained the harms these metals and can cause. They explained that arsenic, lead, mercury, and cadmium, four heavy metals found in the Baby Foods, are neurotoxins. Exposures to these four heavy metals "diminish quality of life, reduce academic achievement, and disturb behavior, with profound consequences for the welfare and productivity of entire societies."[7] The four heavy metals "can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder (ADHD)."[8] Even trace amounts of these heavy metals can alter the developing brain and erode a child's IQ.[9] Arsenic causes potentially irreversible damage, including "cognitive

[5] *See id*.; *see also* SUBCOMMITTEE ON ECON. AND CONSUMER POLICY, COMM. ON OVERSIGHT AND REFORM, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (Feb. 4, 2021) at 2, https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (hereinafter, "House Report").
[6] Healthy Babies Bright Futures Report at 19-28.
[7] *Id.* at 13.
[8] *Id.* at 6.
[9] *Id.* at 1.

deficits among school-age children exposed early in life, and neurological problems in adults who were exposed to arsenic-poisoned milk as infants."[10] According to the Healthy Babies Bright Futures Report, research continues to confirm that exposure to food containing arsenic, lead, mercury, and cadmium poses "troubling risks for babies, including cancer and lifelong deficits in intelligence[.]"[11]

**B.    A Recent Congressional Report Also Found Harmful Heavy Metals in HappyBABY Organics Baby Foods**

22.    A recent congressional report from the Subcommittee on Economic and Consumer Policy of the House Oversight Committee found that HappyBABY Organics baby foods "contain significant levels of toxic heavy metals, including arsenic, lead, cadmium and mercury, *which can endanger infant neurological development*."[12]

23.    The Subcommittee requested documentation from the largest baby food manufacturers in the United States, and the companies that responded (including Defendant) produced their internal testing policies, test results for ingredients/finished products (if the company tested its finished products), and documentation about what the companies did with the ingredients and/or finished products that exceeded their internal testing limits.[13]

24.    Defendant produced its testing policies, select test results of its raw ingredients, select test results of finished baby food products, and its documentation about what it did with the ingredients that exceeded internal testing limits to the Subcommittee.

25.    The Subcommittee concluded that Defendant used ingredients in its baby food that contained arsenic, lead, cadmium, and mercury.[14]

---

[10] *Id.* at 13.
[11] *Id.*
[12] House Report at 2.
[13] *Id.*
[14] House Report at 3-4.

26.     The Subcommittee also found that Nurture "routinely sold products" containing heavy metals in excess of its internal standards, and that Nurture sold products even after testing confirmed that they contained dangerously high levels of heavy metals.[15]

### C.     The Dangers of the Heavy Metals in HappyBABY Organics Baby Foods Are Well-Documented

27.     The findings by the Congressional Subcommittee and Happy Babies Bright Futures are particularly alarming because the Food and Drug Administration ("FDA") and the World Health Organization ("WHO") have declared arsenic, lead, cadmium, and mercury "dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects."[16]

### i.     *Arsenic*

28.     The Congressional Subcommittee found that HappyBABY Organics baby foods may contain arsenic. The U.S Environmental Protection Agency and the FDA have documented the risks associated with exposure to arsenic and regulated its amount in water, juice, and in rice cereals for infants. Specifically, based on the risks associated with exposure to arsenic, the EPA and the FDA have set standards for the allowable limit of arsenic at 10 parts per billion ("ppb") in drinking water,[17] bottled water,[18] and apple juice[19] intended for human consumption. The FDA has also set the action level for inorganic arsenic in rice cereals for infants at 100 ppb.[20] Defendant used ingredients with much higher levels of arsenic in its HappyBABY Organics baby foods.

29.     The Subcommittee noted that Nurture's internal goal threshold for arsenic is 100 ppb, but that Nurture routinely sold products that exceeded these internal standards.[21] For instance,

---

[15] *Id.* at 14.
[16] *Id.* at 2.
[17] 40 C.F.R. § 141.62.
[18] 21 C.F.R. § 165.110(b)(4)(iii)(A).
[19] U.S. FOOD & DRUG ADMIN., *Draft Guidance for Industry, Arsenic in Apple Juice: Action Level* (July 2013), https://www.fda.gov/media/86110/download.
[20] U.S. FOOD & DRUG ADMIN., *Inorganic Arsenic in Rice Cereals for Infants: Action Level Guidance for Industry* (Aug. 2020), https://www.fda.gov/media/97234/download.
[21] House Report at 14.

Nurture sold one of the Tainted Baby Foods despite test results showing that it contained 180 ppb inorganic arsenic.[22]

30.     Moreover, over *twenty-five percent* of the products that Nurture tested for inorganic arsenic contained levels exceeding Nurture's internal standard.[23] In addition, the average amount of inorganic arsenic in the HappyBABY Organics baby food products that Defendant tested and sold was 59.54 ppb—over five times the allowable amount of inorganic arsenic in apple juice.[24]

### ii.     *Lead*

28.     The Subcommittee also found that the Tainted Baby Foods may contain lead—a known neurotoxin and human carcinogen.

29.     Lead exposure can seriously harm children's nervous systems and developing brains and is associated with a range of negative health outcomes including "behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth."[25]

30.     Because lead can accumulate in the body, even very low levels of exposure can become hazardous over time.[26] Indeed, "[n]o safe level of exposure has been identified."[27] Studies have demonstrated that childhood exposure to lead is strongly linked to an adverse effect on academic achievement.[28] One study found that "children age 0 to 24 months lose more than 11 million IQ points from exposure to arsenic and lead in food." A correlation has also been established between

---

[22] *Id.*
[23] *Id.* at 15.
[24] *Id.*
[25] *Id.* at 11 (citing U.S. FOOD & DRUG ADMIN., *Lead in Food, Foodwares, and Dietary Supplements*, https://www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements (last visited Feb. 17, 2021)).
[26] *Id.*
[27] Healthy Babies Bright Futures Report at 13.
[28] House Report at 11.

lead exposure and Attention Deficit Hyperactivity Disorder.[29] Troublingly, the cognitive effects caused by early childhood exposure to lead appear to be permanent.[30]

31.      Although there is no federal standard for lead in baby food, experts, including the American Academy for Pediatrics, the Environmental Defense Fund, and Consumer Reports, agree that lead in baby foods should not exceed 1 ppb.[31] The FDA has set the maximum lead level in bottled water to 5 ppb.[32]

32.      The Subcommittee found that Nurture sold products with significant amounts of lead. Specifically, the Subcommittee concluded that Nurture sold products that tested as high as 641 ppb lead—over six times higher than its internal limit of 100 ppb lead.[33] In addition, Nurture sold five other products that they tested and that contained over 50 ppb lead.[34]

33.      Troublingly, the Subcommittee stated that "[i]t is not clear that even one of Nurture's baby food products registered at or below 1 ppb lead, which should be the upper limit for lead content according to the health experts at Consumer Reports, the Environmental Defense Fund, and the American Academy of Pediatrics."[35]

### iii.      Cadmium

34.      The Tainted Baby Foods may also contain cadmium,[36] which has been observed to cause anemia, liver disease, and nerve or brain damage in animals that consume it.

35.      Cadmium is linked to neurotoxicity, cancer, and kidney, bone, and heart damage.[37] Scientists have reported a "tripling of risk for learning disabilities and special education among children

---

[29] *Id.*at 12 (citing Gabriele Donzelli et al., *The Association Between Lead and Attention-Deficit/Hyperactivity Disorder: A Systematic Review*, INT'L J. ENVTL. RES. & PUB. HEALTH (Jan. 29, 2019), www.mdpi.com/1660-4601/16/3/382/htm).
[30] *Id.* at 11.
[31] House Report at 27.
[32] Healthy Babies Bright Futures Report at 16.
[33] House Report at 22.
[34] *Id.*
[35] *Id.* at 23.
[36] *Id.* at 30.
[37] Healthy Babies Bright Futures Report at 14.

with higher cadmium exposures, at levels common among U.S. children[.]"[38] Cadmium also "displays a troubling ability to cause harm at low levels of exposure."[39] The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a probable human carcinogen.[40]

36.     The EPA and FDA have set the standards for the allowable limit of cadmium in drinking water[41] and bottled water[42] at 5 ppb. The WHO has established a maximum amount of cadmium in drinking water at 3 ppb.[43]

37.     The Subcommittee concluded that sixty-five percent of the tested HappyBABY Organics baby foods contained more than 5 ppb cadmium, which is the EPA's limit for drinking water.[44] Nurture sold one product that contained 49 ppb cadmium.[45]

### *iv.   Mercury*

38.     The Tainted Baby Foods also may contain mercury,[46] which increases the risk for cardiovascular disease and can cause vision, intelligence, and memory problems for children exposed in utero. Exposure to mercury has been linked to higher risk of lower IQ scores and intellectual disability.[47]

39.     Recognizing the harm caused by ingestion of mercury, EPA has set the maximum mercury level in drinking water to 2 ppb.[48]

---

[38] *Id.*

[39] *Id.*

[40] ATSDR, DEP'T OF HEALTH AND HUMAN SERV., *Public Health Statement: Cadmium* (Sept. 2012), https://www.atsdr.cdc.gov/toxprofiles/tp5-c1-b.pdf.

[41] 40 C.F.R. § 141.62(b).

[42] 21 C.F.R. § 165.110(b)(4)(iii)(A).

[43] WORLD HEALTH ORGANIZATION, *Cadmium in Drinking Water* (2011), https://www.who.int/water_sanitation_health/water-quality/guidelines/chemicals/cadmium.pdf?ua=1.

[44] House Report at 30.

[45] *Id.*

[46] *See* Healthy Babies Bright Futures Report at 19-28 (independent test results showing that HappyBABY Organics baby food products contain mercury).

[47] Healthy Babies Bright Futures Report at 14.

[48] 40 C.F.R. § 141.62(b).

40.     The Subcommittee noted that Nurture sold finished baby food products containing as much as 10 ppb mercury, and that Nurture sold fifty-six products that containing over 2 ppb mercury.[49]

41.     Despite the known risks of exposure to these heavy metals, Nurture has negligently, recklessly, and/or knowingly sold the Tainted Baby Foods without disclosing that they may contain arsenic, mercury, cadmium, and lead to consumers like Plaintiff.

42.     Given the well documented dangers of the heavy metals that may be in the Tainted Baby Foods, reasonable consumers, like Plaintiff, would consider the mere presence or risk of heavy metals as a material fact in considering what baby food products to purchase.

43.     Defendant declares on its website that its "Quality and Food Safety program is designed to ensure that all our products are safe for every baby and toddler . . . . We are also a leader in the industry on rigorous methodology, routinely testing both our ingredients and finished products to assure they are safe and healthy for baby."[50] Defendant also states that its testing protocols are "best-in-class."[51] As such, Defendant knew or should have known that the Tainted Baby Foods contained or had a risk of containing dangerous levels of heavy metals. Additionally, Defendant knew or should have known that its ingredients, and the final products, could contain materials such as toxins and heavy metals. Yet, Defendant marketed and sold the Tainted Baby Foods, even after its own testing showed that the foods contained dangerous materials.

44.     Additionally, Defendant knew or should have known that Plaintiff and other consumers would feed the Tainted Baby Food multiple times each day to their children, making these

---

[49] House Report at 32.
[50] *Quality & Safety of Our Products*, https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/ (last visited Mar. 10, 2021).
[51] *Id.*

contaminated products the primary sources of food for their children. This necessarily leads to repeated exposure of heavy metals to children.

45.     Defendant knew or should have expected that the presence or risk of heavy metals in its baby food products is a fact that an average consider would consider when purchasing baby food.

46.     As a result of these false or misleading statements and omissions, Defendant has generated substantial sales of the Tainted Baby Foods.

47.     Plaintiff brings this action individually and on behalf of all other similarly situated consumers who purchased the Tainted Baby Foods, in order to cause the disclosure of the presence or risk of heavy metals that pose a known risk to infants in the Tainted Baby Foods, to correct the false and misleading perception Defendant has created in the minds of consumers that the Tainted Baby Foods are high quality, safe, and healthy, and to obtain redress for those who have purchased the Tainted Baby Foods.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action individually and on behalf of the following Class pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

All persons in the United States who, from January 1, 2017, to the present, purchased the Tainted Baby Foods for household or personal use (the "Class").

49.     Plaintiff also brings this action individually and on behalf of the following Florida Sub-Class:

All persons who, from January 1, 2017, to the present, purchased the Baby Foods for household or business use in Florida (the "Florida Sub-Class").

50.     Excluded from the Class and Sub-Class are the Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all government entities, and any judge, justice, or judicial officer presiding over this matter.

17

51.     This action is brought and may be properly maintained as a class action.

52.     The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of the proposed Class in a single action will provide substantial benefits to the parties and Court.

53.     Questions of law and fact common to Plaintiff and members of the Classes include, but are not limited to, the following:

A.   Whether Defendant wrongfully represented and continues to represent that the Tainted Baby Foods are healthy, nutritious, and safe for human consumption;

B.   Whether Defendant wrongfully represented and continues to represent that the Tainted Baby Foods are "non-GMO";

C.   Whether Defendant wrongfully represented and continues to represent that the Tainted Baby Foods are organic;

D.   Whether Defendant wrongfully represented and continues to represent that the Tainted Baby Foods appropriate are appropriate for consumption by various "stages" of babies;

E.   Whether Defendant wrongfully failed to disclose that the Tainted Baby Foods contained or may contain heavy metals;

F.   Whether Defendant's representations in advertising, warranties, packaging, and/or labeling are false, deceptive, and misleading;

G.   Whether those representations are likely to deceive a reasonable consumer;

H.   Whether a reasonable consumer would consider the presence or risk of heavy metals as a material fact in purchasing baby food;

I.   Whether Defendant had knowledge that those representations were false, deceptive, and misleading;

18

J.  Whether Defendant knew or should have known that the Tainted Baby Foods contained or may contain heavy metals;

K.  Whether Defendant continues to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

L.  Whether a representation that a product is healthy, superior quality, nutritious, and safe for consumption and does not contain arsenic, mercury, cadmium, and/or lead is material to a reasonable consumer;

M.  Whether Defendant's representations and descriptions on the labeling of the Tainted Baby Foods are likely to mislead, deceive, confuse, or confound consumers acting reasonably;

N.  Whether Defendant violated the laws of the State of Florida;

O.  Whether Defendant breached its implied warranties;

P.  Whether Defendant engaged in unfair trade practices;

Q.  Whether Defendant engaged in false advertising;

R.  Whether Defendant made negligent and/or fraudulent misrepresentations and/or omissions;

S.  Whether Plaintiff and the members of the Class are entitled to actual, statutory, and punitive damages; and

T.  Whether Plaintiff and members of the Class are entitled to declaratory and injunctive relief.

54.  Common issues predominate here where Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other members of the Classes. Identical statutory violations, business practices, and harms are

19

involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

55.     Plaintiff's claim is typical of those of the members of the Classes, since all of the claims are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

56.     Plaintiff will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

57.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Classes is sufficiently small such that, absent representative litigation, it would be impractical for members of the Classes to redress the wrongs done to them.

58.     As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

### COUNT I
**Breach of Express Warranty Against Defendant on Behalf of Plaintiff and the Class**

59.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

60.     Defendant marketed and sold the Baby Foods into the stream of commerce with the intend that the Tainted Baby Foods would be purchased by Plaintiff and the Class.

61.     Defendant expressly warranted, advertised, and represented to Plaintiff and the Class that its baby foods are:

      A.  Organic;

      B.  Non-GMO; and

      C.  Appropriate for consumption by certain stages of babies, including "crawling," "sitting," and "walking" babies.

62.     Defendant made these express warranties regarding the Tainted Baby Foods' quality, ingredients, and fitness for consumption in writing on the Tainted Baby Foods' packaging and labels through its website, advertisements, and marketing materials. These express warranties became part of the basis of the bargain that Plaintiff and the Class entered into upon purchasing the Tainted Baby Foods.

63.     Defendant's advertisements, warranties, and representations were made in connection with the sale of the Tainted Baby Food to Plaintiff and the Class. Plaintiff and the Class relied on Defendant's advertisements, warranties, and representations regarding the Tainted Baby Foods in deciding whether to purchase Defendant's products.

64.     Defendant's baby foods do not conform to Defendant's advertisements, warranties, and representations in that they:

      A.   Are not organic or suitable for consumption by human babies; and

      B.   Contain or may contain levels of various heavy metals.

65.     Defendant was on notice of this breach as they were aware of the included heavy metals in the Tainted Baby Foods and based on the public investigation by the Healthy Babies Bright Futures report that showed its baby food products as unhealthy and containing dangerous levels of heavy metals.

66.     Privity exists because Defendant expressly warranted to Plaintiff and the Class through the warranting, packaging, advertising, marketing, and labeling that the Tainted Baby Foods were healthy, natural, and suitable for consumption and by failing to make any mention of heavy metals or other unnatural ingredients.

67.     As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they purchased Tainted Baby Foods that were not only worth less than the price they paid, but they would not have purchased at all had, they known of the risk and/or

presence of heavy metals or other unnatural ingredients that do not conform to the products' labels, packaging, advertising, and statements.

68.     Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's failure to deliver goods conforming to their express warranties and resulting breach.

## COUNT II
### Breach of Implied Warranty of Merchantability Against Defendant
### on Behalf of Plaintiff and the Class

69.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

70.     Defendant is a merchant engaging in the sale of goods to Plaintiff and the Class.

71.     There was a sale of goods from Defendant from Plaintiff and the Class.

72.     At all times mentioned herein, Defendant manufactured or supplied the Tainted Baby Foods, and prior to the time the Tainted Baby Foods were purchased by Plaintiff and the Class, Defendant impliedly warranted to them that the Tainted Baby Foods were of merchantable quality, fit for their ordinary use (consumption by babies), and conformed to the promises and affirmations of fact made on the Tainted Baby Foods' containers and labels, including that the food was natural, safe, and appropriate for consumption by human infants. Plaintiff and the Class relied on Defendant's promises and affirmations of fact when they purchased the Tainted Baby Foods.

73.     The Tainted Baby Foods were not fit for their ordinary use (consumption by babies) and did not conform to Defendant's affirmations of fact and promises as they contained or were at risk of containing heavy metals and/or other ingredients or contaminants that do not conform to the packaging.

74.     Defendant breached its implied warranties by selling Tainted Baby Foods that failed to conform to the promises or affirmations of fact made on the container or label as each product

contained heavy metals and/or unnatural or other ingredients or contaminants that do not conform to the packaging.

75.    Defendant was on notice of this breach, as it was aware of the heavy metals included or at risk of being included in the Tainted Baby Foods and based on the public investigation by Healthy Babies Bright Futures that showed Defendant's baby foods were unhealthy, contaminated, and potentially dangerous, as well as the extensive press coverage of the investigation.

76.    Privity exists because Defendant impliedly warranted to Plaintiff and the Class through the warranting, packaging, advertising, marketing, and labeling that the Tainted Baby Foods were natural and suitable for consumption by babies, and by failing to make any mention of heavy metals or other unnatural ingredients.

77.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they have purchased baby food that is worth less than the price they paid and that they would not have purchased at all had they known of the presence or risk of heavy metals or other unnatural ingredients.

78.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's failure to deliver goods conforming to their implied warranties and resulting breach.

## COUNT III
**Fraudulent Misrepresentation Against Defendant on Behalf of Plaintiff and the Class**

79.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.    Defendant falsely represented to Plaintiff and the Class that the Tainted Baby Foods are:

A.  Organic;

B.  Non-GMO; and

23

C.   Appropriate for consumption by certain stages of babies, including "crawling," "sitting," and "walking" babies.

81.   Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and the Class to purchase its baby foods.

82.   Defendant knew that its representations about the Tainted Baby Foods were false in that the Tainted Baby Foods contained or were at risk of containing levels of heavy metals or other unnatural ingredients that do not conform to the products' labels, packaging, advertising, and statements. Defendant allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, including Plaintiff and the Class.

83.   Plaintiff and the Class did in fact rely on these misrepresentations and purchased the Tainted Baby Foods to their detriment. Given the deceptive manner in which Defendant advertised, represented, and otherwise promoted the Tainted Baby Foods, Plaintiff's and the Class members' reliance on Defendant's misrepresentations was justifiable.

84.   As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they have purchased Tainted Baby Food that is worth less than the price they paid and that they would not have purchased at all had they known of the presence or risk of heavy metals or other unnatural ingredients that do not conform to the products' labels, packaging, advertising, and statements.

85.   Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

## COUNT IV
### Fraudulent Concealment on Behalf of Plaintiff and the Class

86.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

87.     Defendant concealed from and failed to disclose to Plaintiff and the Class that the Tainted Baby Foods contained or were at risk of containing heavy metals or other unnatural ingredients that do not conform to the products' labels, packaging, advertising, and statements.

88.     Defendant had a duty to disclose to Plaintiff and the Class the true quality, characteristics, ingredients, suitability, and risks of the Tainted Baby Foods because: (1) Defendant was in a superior position to know the true state of facts about its products; (2) Defendant was in a superior position to know the actual ingredients, characteristics, and suitability of the Tainted Baby Foods for consumption by babies; and (3) Defendant knew that Plaintiff and the Class could not have reasonably have been expected to learn or discover that the Tainted Baby Foods were misrepresented in the packaging, labels, advertising, and websites prior to purchasing the Tainted Baby Foods.

89.     The facts concealed or not disclosed by Defendant to Plaintiff and the Class are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Tainted Baby Foods.

90.     Plaintiff and the Class justifiably relied on Defendant's omissions to their detriment. The detriment is evident from the true quality, characteristics, and ingredients of the Tainted Baby Foods, which is inferior in comparison to Defendant's advertisements and representations of the Tainted Baby Foods.

91.     As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they have purchased Tainted Baby Food that is worth less than the price they paid and that they would not have purchased at all had they known of the presence or risk of dangerous levels of heavy metals and toxins.

92.     Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

**COUNT V**
**Negligent Misrepresentation on Behalf of Plaintiff and the Class**

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.     Defendant had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the formulation, testing, manufacturing, marketing, distribution, and sale of the Tainted Baby Foods.

95.     Defendant breached its duty to Plaintiff and the Class by formulating, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiff and the Class that do not have the ingredients, qualities, characteristics, and suitability for consumption as advertised by Defendant and by failing to promptly remove the Tainted Baby Foods from the marketplace or to take other appropriate remedial action.

96.     Defendant knew or should have known that the ingredients, qualities, and characteristics of the Tainted Baby Foods were not as advertised or suitable for their intended use (consumption by babies) and were otherwise not as warranted and represented by Defendant. Specifically, Defendant knew or should have known that: (1) the Tainted Baby Foods were not organic, nutritious, healthy, or safe for consumption because they contained or had a risk of containing levels of heavy metals and/or other unnatural ingredients or contaminants that do not conforming to the packaging; (2) the Tainted Baby Foods were adulterated or at risk of being adulterated by heavy metals; and (3) the Tainted Baby Foods were otherwise not as warranted and represented by Defendant.

97.     Plaintiff and the Class justifiably and reasonably relied on Defendant's representations as to the ingredients, qualities, and characteristics of the Tainted Baby Foods.

98.     As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they have purchased Tainted Baby Food that is worth less than the price they paid and that they would not have purchased at all, had they known of the presence or risk

of heavy metals or other unnatural ingredients that do not conform to the products' labels, packaging, advertising, and statements.

99.     Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

## COUNT VI
### Unjust Enrichment on Behalf of Plaintiff and the Class

100.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.     Substantial benefits have been conferred on Defendant by Plaintiff and the Class through their purchase of the Tainted Baby Foods. Defendant knowingly and willingly accepted and enjoyed these benefits.

102.     Defendant either knew or should have known that the payments rendered by Plaintiff and the Class were given and made with the expectation that the Tainted Baby Foods would have the qualities, characteristics, ingredients, and suitability for consumption represented and warranted by Defendant. As such, it would be inequitable for Defendant to retain the benefit of the payments under the circumstances.

103.     Defendant's acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendant to retain the benefits and not return the value of payments made by Plaintiff and the Class.

104.     Plaintiff and the Class are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

105.     Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

## COUNT VII
### Violation of Florida's Deceptive and Unfair Trade Practices Act § 501.201, *et seq.*, on Behalf of Plaintiff and the Florida Sub-Class

27

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). Defendant participated in unfair, unconscionable, and deceptive trade practices in violation of FDUTPA as described herein.

108.    Plaintiff and the members of the Florida Sub-Class are "consumers" within the meaning of FDUTPA. Fla. Stat. § 501.203(7).

109.    Defendant engaged in "trade or commerce" within the meaning of FDUTPA. Fla. Stat. § 501.203(8).

110.    Plaintiff and the Florida Sub-Class members would not have purchased the Tainted Baby Foods for their children had they known the truth about the presence or risk of toxic heavy metals.

111.    Defendant's statements that the Tainted Baby Foods are nutritious, natural, organic, healthy, and safe for consumption by babies are literally false and likely to deceive the public, as is Defendant's failing to make any mention of the presence or risk of heavy metals in the Tainted Baby Foods.

112.    Defendant's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Tainted Baby Foods is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

113.    Defendant's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Baby Foods is also unfair because the consumer injury is substantial, not outweighed

by benefits to consumers or competition, and not one that consumers themselves can reasonably avoid.

114.    Defendant's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Tainted Baby Foods constitutes an unconscionable commercial practice in that Defendant has, by knowingly selling products containing toxic heavy metals and using false statements and/or material omissions, failed to properly represent and/or concealed the presence of heavy metals in its Tainted Baby Foods.

115.    As a direct and proximate result of Defendant's acts and omissions, Plaintiff and the other members of the Florida Sub-Class have suffered damages for which they are entitled to relief pursuant to Fla. Stat. § 501.211(2) and which include, without limitation, a full refund for the Tainted Baby Foods they have purchased, all of which constitute cognizable damages under FDUTPA.

116.    Pursuant to Fla. Stat. § 501.2105, Plaintiff, individually and as a member of the Florida Sub-Class, is entitled to recover costs and reasonable attorneys' fees in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and behalf of all others similarly situated, prays for judgment against the Defendant as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiff and her counsel to represent the Class, and requiring Defendant to bear the costs of class notice;

B.    An order enjoining Defendant from selling the Tainted Baby Foods until the levels of heavy metals are removed or full disclosure of the presence of such appears on all labels, packaging, and advertising;

C.    An order enjoining Defendant from selling the Tainted Baby Foods in any manner or suggestion implying that they are healthy, natural, and safe for consumption;

D.      An order requiring Defendant to engage in a corrective advertising campaign and engage in further necessary affirmative injunctive relief, such as recalling existing products;

E.      An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from containing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

F.      An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of law, plus pre- and post-judgment interest thereon;

G.      An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

H.      An order requiring Defendant to pay all actual damages permitted under the counts alleged herein;

I.      An order requiring Defendant to pay all statutory damages permitted under the counts alleged herein;

J.      An order requiring Defendant to pay punitive damages on any count so allowable;

K.      An order awarding attorneys' fees and costs, including the costs of pre-suit investigation, to Plaintiff and the Class; and

L.      An order providing for all other such equitable relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  March 11, 2021

By: /s/ Jonathan K. Tycko
Jonathan K. Tycko
Hassan A. Zavareei (*pro hac vice* to be filed)
Allison W. Parr (*pro hac vice* to be filed)
**TYCKO & ZAVAREEI LLP**
1828 L Street, NW Suite 1000
Washington, DC 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
jtycko@tzlegal.com
hzavareei@tzlegal.com
aparr@tzlegal.com

Annick M. Persinger (*pro hac vice* to be filed)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
apersinger@tzlegal.com

*Counsel for Plaintiff and the Putative Class*